MELISSA P. BARNARD
Nevada Bar No. 4916
FRANK Z. LAFORGE
Nevada Bar No. 12246
University of Nevada, Reno
1664 North Virginia Street/MS550
Reno, Nevada 89557-0550
(775) 784-3492
(775) 327-2202-FAX
*Attorney for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ALICE WIELAND,

Plaintiff,

vs.

BOARD OF REGENTS OF THE NEVADA
SYSTEM OF HIGHER EDUCATION, a
political subdivision of the State of Nevada,

Defendant.

_____/

3:19-CV-00724-MMD-CLB

**MOTION FOR SUMMARY JUDGMENT**

Defendant Board of Regents of the Nevada System of Higher Education ("Defendant" or "NSHE"), respectfully moves the Court for summary judgment in its favor and against Plaintiff Alice Wieland ("Wieland"). NSHE is entitled to summary judgment as a matter of law as there are no genuine issues of material fact regarding the claims Wieland brought against NSHE. This Motion is brought pursuant to Federal Rule of Civil Procedure 56 and is based on all records, documents, pleadings, exhibits and papers on file or to be filed in this matter, the points and authorities, arguments of counsel and any other matter that may properly come before the Court for its consideration of this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.      **INTRODUCTION**

Wieland claims she was denied tenure and promotion at the University of Nevada, Reno ("University"), an institution of NSHE, because of her age, sex and national origin. Wieland's claims rest on the presumption that she would achieve tenure even though tenure is not guaranteed and courts grant universities academic deference in tenure determinations.  Under the NSHE Code and Wieland's contract, the University's decision to not grant Wieland tenure was completely discretionary. To be awarded the privilege of tenure at the University, a faculty member must demonstrate excellent abilities in research and teaching to convince the University community that the faculty member's future trajectory in these areas justifies the privileges afforded by tenure. Wieland's teaching, as documented by her annual evaluations, her tenure application, student evaluations, and even her own admissions, was below average and a continual problem.  Further, Wieland's research also had shortcomings, including that she lacked publications in top tier journals for her area of specialty.  Given the weakness of Wieland's tenure application, she failed to obtain a rating of excellent in either teaching or research, as required by her employment contract and the NSHE Code, and therefore, she did not meet the requirements for tenure.

Nevertheless, Wieland wants the Court to ignore her shortcomings in teaching and research by claiming, with no evidence or proof, that her tenure denial was because of her age, sex and national origin. Wieland produces no direct evidence that discrimination played a role in that determination. Wieland also wants the Court to ignore the reasoning, deliberations and recommendations undertaken by numerous University personnel and committees that provided multiple levels of review of Wieland's tenure application.  As will be shown below, the undisputed facts establish Wieland cannot prove the University denied her tenure application based upon her age, gender or national origin or that the decision to deny her tenure was a violation of the terms of her employment contract or the law. In addition, Wieland is precluded from bringing several claims under federal law.

## II.   **STATEMENT OF UNDISPUTED FACTS**

**A.   Parties.**

NSHE is a governmental entity established by the Constitution of the State of Nevada. Nevada Constitution, Article 11, Section 4; NSHE Code, Title 2, Chapter 1, Section 1.2.1, the NSHE Code attached hereto as Exhibit 1 and incorporated herein by reference.[1] The University is a member institution of NSHE.  Exhibit 1, NSHE Code, Title 2, Chapter 1, Section 1.4.3, p.3. Wieland began her employment with the University in 2012. *See* 2012-2013 Contract, attached hereto as Exhibit 2 and incorporated herein by reference. Wieland's contract was for the position of assistant professor in the Department of Managerial Sciences in the College of Business and she was hired in a "tenure eligible" position, which means the position is one which can lead to tenure. *Id.* Wieland has acknowledged the term "tenure eligible" does not mean tenure is guaranteed. Wieland Deposition Transcript ("Wieland Depo"), p. 50, ll. 17-19, attached hereto as Exhibit 3 and incorporated herein by reference.

**B. UNR Tenure Process.**

Tenure at the University is governed by the NSHE Code, University bylaws, the College bylaws and the Department bylaws.[2]  While the NSHE Code and applicable bylaws govern the tenure process, only the NSHE Code is part of Wieland's contract of employment. 2016-2017 Contract, attached hereto as Exhibit 4 and incorporated herein by reference; Exhibit 1, NSHE Code, Sections 3.3 and 5.4.3.[3]  Wieland's contract specifically states that only Title 2 of the NSHE Code, exclusive of any bylaws or other policies, is incorporated into the contract and made a part of the contract. Exhibit 4, 2016-2017 Contract.  The contract also specifically states, "Any other . . . understanding, promises . . . or representations . . . not specified in the REMARKS section above . . . shall not be considered a part of the contract of employment." *Id.*

---

[1] The relevant Code sections to this Motion are attached to the Motion in one exhibit for the Court's convenience.

[2] The NSHE Code, which is Title 2 of the Board of Regents Handbook, establishes the primary organizational structure of NSHE and the basic personnel policies for its faculty. The NSHE Code has the force and effect of law.  *State, ex. rel. Richardson v. Board of Regents*, 261 P.2d 515, 518 (1983).

[3] The 2016-2017 Contract document is applicable for the 2017-2018 fiscal year as well.  See, Exhibit 1, NSHE Code, Chapter 5, Section 5.4.4, p. 18.

Faculty who are tenure eligible must serve in a probationary period before receiving a tenure appointment. Exhibit 1, NSHE Code, Section 3.3.1, p. 6. Generally, the probationary period for all academic faculty eligible for tenure must not exceed seven years of uninterrupted full-time employment. *Id.* After completion of the probationary period, if the faculty member does not receive tenure, the faculty member cannot be reappointed at the University. Exhibit 1, NSHE Code, Section 3.3.4, p. 8. In other words, if a tenure eligible professor does not obtain tenure by their seventh year, the professor will be terminated and thereafter, will not be able to be reemployed by the University.

Pursuant to the NSHE Code, the major objectives of tenure are to provide a faculty committed to excellence and to provide a substantial degree of security to those persons who have exhibited excellent abilities, sufficient to convince the UNR community that their expected services and performances in the future justify the privileges afforded by tenure. Exhibit 1, NSHE Code, Section 3.4.2(b), p. 8.

The NSHE Code states that the evaluation and recommendation of an academic faculty member for tenure shall include the application of three specific standards and the ratings contained in Subsection 3.4.2. Exhibit 1, NSHE Code, Section 3.4.2, p.8. The specific standards described in the NSHE Code which are used to evaluate the faculty member's body of work are: (1) teaching/performance of assigned duties ("teaching"); (2) scholarly, creative and entrepreneurial activity ("research"): and (3) service. Exhibit 1, NSHE Code, Section 3.4.2(a), p. 8. The specific ratings described in the NSHE Code which are used to rate the applicant in the areas of teaching, research and service are: (1) excellent: (2) commendable; (3) satisfactory; or (4) unsatisfactory. *Id.*

To be recommended for appointment with tenure, a faculty member must receive an "excellent" rating in either the teaching standard or research standard and no less than a "satisfactory" rating in the other category. Exhibit 1, NSHE Code, Section 3.4.2(a); Managerial Sciences ("MGRS") Department Bylaws, Section 5.4, attached as Exhibit 5 and incorporated herein by reference. The applicant has the burden of demonstrating these standards have been met. Exhibit 1, NSHE Code, Section 3.4.2(a), p. 8.

The teaching standard is defined as a record of effectiveness as a teacher which includes but is not limited to, demonstrated teaching competence and efficiency in a classroom, laboratory,

and/or clinical setting, the ability to communicate effectively with students and demonstrated skill in handling classroom and other duties related to teaching.   Exhibit 1, NSHE Code, Section 3.4.2(a)(1)(A), p. 8.  Such a record may include a showing of the ability to impart knowledge, to excite students' interest in the subject matter, to evoke response in students and to demonstrate competence in advising students. *Id.*   The research standard is defined as a demonstrated continuing professional growth related to the academic faculty member's discipline or program area as shown by a record of scholarly research or creative activity resulting in publication or comparable productivity. Exhibit 1, NSHE Code, Section 3.4.2(a)(2), p. 9.

The College of Business bylaws specifically state that a faculty member at the rank of assistant professor shall be eligible for promotion to the rank of associate professor when he or she has established a substantial record of achievement in teaching, research and service. College of Business bylaws, Section 7.5.1, attached hereto as Exhibit 6 and incorporated herein by reference. Similarly, promotion requires that the department's recommendation shall include an "excellent" evaluation for either teaching or scholarly activity, and no rankings below "satisfactory." *Id.*

Management faculty are part of the Managerial Sciences Department.[4] Pursuant to the Managerial Sciences ("MGRS") Department bylaws, a faculty member's performance must be evaluated to determine whether an individual faculty member's performance is "excellent," "commendable," "satisfactory," or "unsatisfactory" in the three areas of teaching, research, and service and in their overall performance.  Exhibit 5, MGRS Department Bylaws, Section 5.2, p. 12. The quality of work in categories of research and teaching are to be evaluated in conjunction with the faculty member's role statement. *Id.*

The MGRS Department bylaws state that the evaluation of teaching shall include but not be limited to: (1) student evaluations; (2) quality of course material; and (3) external teaching activities including, but not be limited to, student advising, supervision of theses, supervision of independent studies, and coordination of student activities in professional organizations. Exhibit 5, MGRS Department Bylaws, Section 5.2, p. 12.

---

[4] At the time Wieland applied for tenure, the Managerial Sciences Department was comprised of three sub-departments: Managerial Sciences, Finance and Marketing. Exhibit 5, MGRS Department bylaws, Section 2.1, p. 3.

Both the University and College of Business bylaws state that promotion to associate professor, as Wieland was seeking, requires confidential reviews by at least four qualified professionals in the applicant's discipline from outside the university.   Exhibit 6, College of Business bylaws, section 7.5.1; University bylaws, Section 3.3.5, attached hereto as Exhibit 7 and incorporated herein by reference.   In selecting reviewers, the department chair must consult with the department faculty or the department personnel committee. The chair may solicit recommended reviewers from the applicant, but such recommendations are to be advisory only.   Exhibit 7, University bylaws, Section 3.3.5.

The review process for a tenure application in the MGRS bylaws state that an application for promotion and tenure by a management faculty member is first reviewed by the sub-department personnel committee for management ("MGMT Sub-Committee"), which makes a recommendation to the Managerial Science Department Personnel Committee (the "Department Committee").   Exhibit 5, MGRS Department Bylaws, Section 5, p.12. The Department Committee will then make a recommendation to the faculty member's department chair, who will make a recommendation to the dean. *Id*

If there is a recommendation to deny tenure, the faculty member may request reconsideration. Exhibit 1, NSHE Code, Section 5.2.4, p. 15.   The request must be made to the department chair, supervisor or dean who rendered the negative recommendation and must include the reasons, arguments and documentation supporting the request for reconsideration. *Id.*   The request for reconsideration must be directed through regular administrative channels with recommendations for or against reconsideration of the decision. *Id.*   Final action by the University president is to be taken within a reasonable time after the president receives the recommendations. *Id.*

**C.   Wieland's Research and Teaching Record.**

Wieland was notified in her third and fourth-year reviews that she needed to work on her research output and target her research endeavors on peer-reviewed acceptable journals.   Third Year Review from department personnel committee to department chair, attached hereto as Exhibit 8 and incorporated herein by reference.   She was specifically told to target high quality journals after her fourth-year review. Fourth Year Review from department personnel committee to department chair, attached hereto as Exhibit 9 and

6

incorporated herein by reference.  As of the time of her Fourth Year Review, she did not have the quantity or quality of research productivity for tenure and promotion. *Id.*

At the time of her tenure application, Wieland had published eight papers, one accepted in 2017, two appearing in 2017, three in 2016, one in 2014, and one in 2012.  Department Tenure Review Memorandum, dated October 16, 2017, attached hereto as Exhibit 10 and incorporated herein by reference.  None of her publications were in the number one or number two journals in her areas of research and faculty members in management regularly publish in those type of journals.  Management Personnel Sub-Committee ("MGMT Sub-Committee") Reconsideration Memorandum, dated December 5, 2017, p. 9, attached hereto as Exhibit 11 and incorporated herein by reference.  External reviewers who reviewed Wieland's publications and provided feedback for consideration of her tenure application confirmed that she was not publishing in top journals and her citation counts (how many times her articles had been cited), were low.  University Tenure and Promotion Committee Reconsideration Memorandum, dated January 29, 2018, attached hereto as Exhibit 12 and incorporated herein by reference.

It is well documented Wieland struggled with her teaching at the University. Student complaints about Wieland were consistent, persistent and unprecedented. In 2013, her department chair noted there were several student complaints about Wieland's classroom demeanor and advised Wieland to improve her sensitivity with students. Wieland's Annual Evaluation for 2013, attached hereto as Exhibit 13 and incorporated herein by reference.  In 2017, Wieland improperly accused a student of slashing her tires, which was not only inflammatory, but completely baseless, as she later admitted a mechanic informed her that the tire damage was due to a road hazard. Exhibit 11, MGMT Sub-Committee Memo, p. 7; Email from Wieland to Sheri Faircloth, dated May 2, 2017,  attached hereto as Exhibit 14 and incorporated herein by reference.  The MGMT Sub-Committee mentioned this incident with the student in its reconsideration review to demonstrate the outrageousness of Wieland's behavior toward students.  Two students were so concerned about Wieland's poor behavior they complained to the chair and assistant dean and one student felt so disrespected by Wieland that she made arrangements to complete coursework without returning to class for the remainder of the semester. Exhibit 11, MGMT Sub-Committee Memo, p. 7.

Wieland's student evaluations, which include student ratings and comments for her teaching, also demonstrated her struggles in the classroom. For two and a half years prior to her tenure review, on a scale of 0-4, Wieland's student scores for overall teacher quality ranged from 1.1 to 2.9 and her student scores for overall course quality ranged from 1.5 to 3.0. Exhibit 10, Department Tenure Memo, p. 4. Both ratings were below the department average. *Id.* In the Fall 2016 semester, on the 0-4 scale, 45% of her class rated her "0" on clarity of expectations, and 38% gave her a "0" for overall quality of teaching. *Id.*

Wieland repeatedly and consistently garnered negative student comments about her in-class behavior and her inability to be effective in the classroom and such negative comments outnumbered the positive comments. Exhibit 10, Department Tenure Memo, p. 5. Wieland's students repeatedly provided consistent negative comments about her in-class behavior. Exhibit 11, MGMT Sub-Committee Memo, p. 7. Indeed, the MGMT Sub-Committee noted that the student comments were among the most worrisome that members of the MGMT Sub-Committee (including two previous department chairs and College Committee members) had ever seen. *Id.*

Students consistently complained Wieland's lectures were disorganized and that she did not follow the class syllabus. *Id.* Students said Wieland's instructions for homework and projects were unclear and her grading seemed inconsistent or unfair. *Id.* There were also consistent complaints that Wieland interrupted student presentations and was rude, sarcastic or condescending towards students, and had poor control of the classroom. *Id.* Some specific comments from the students include the following:

- "She should not teach this class anymore. Bad classroom environment, she makes no sense and isn't very friendly. Material is not related throughout the semester."
- "Instructor was constantly all over the place and could not be any more unclear on instructions for assignments and research project."
- "She was incredibly condescending to all students, especially when students asked questions in class. This made students unwilling to participate and eager to leave class every day. Maybe the class would be better if she actually had a better outlook and attitude about teaching."

Student Evaluations pp. 269 and 307, part of Tenure Application, attached hereto as Exhibit 15 and incorporated herein by reference.

None of these negative comments were reflective of or referenced Wieland's gender, age or national origin. Rather, the comments addressed objective facets of Wieland's teaching such as her lack of organization, changing expectations in the middle of the semester, unclear guidelines for assignments and lack of respect for students. Exhibit 12, University Committee Memo, p. 2. Wieland's students made these comments consistently across courses and academic years where qualitative evaluations were provided. *Id.*

Wieland was aware of her challenges in the classroom and acknowledged that there were issues with her teaching and that she needed to improve on her teaching skills. Each year in her annual evaluation, Wieland acknowledged that she needed to work on her teaching abilities and needed to significantly increase her teaching ratings. Exhibit 13, 2012-2016 annual evaluations, pp 6. Wieland acknowledged that she had worked with a mentor to help improve her teacher ratings, had read books on how to improve her teaching and had attended a workshop on teaching strategies in the summer of 2017. Exhibit 13, 2012-2016 annual evaluations, pp 6 and 8. Wieland also admitted that her teaching ratings were below average and that her tenure case was marginal because of her poor teaching ratings. Wieland's journal entry dated March 5, 2018, attached hereto as Exhibit 16 and incorporated herein by reference.

Wieland knew that the low student ratings and the student comments were a problem. In fact, she omitted the student course evaluation comments from the tenure packet she submitted. Exhibit 11, MGMT Sub-Committee Memo, p. 4. When asked for the students' written comments by the chair, she asked whether she could provide only the *"good ones"*. *Id.* (emphasis added).

**D.  Wieland's Promotion and Tenure Application, Review and Process.**

1. <u>Initial Review of Tenure Application</u>.

Wieland submitted her tenure application for review prior to the Fall Semester of 2017. Exhibit 15, Application for Promotion and Tenure.[5]  The tenure application packet consisted of the application, her Curriculum Vitae ("CV"), seven published manuscripts, one manuscript and e-mail showing this manuscript had been accepted for prospective publication, an NSF grant application, syllabi for courses, and student course evaluations for Wieland. *Id.* Initially, Wieland did not include the student comments as part of the student evaluations and when questioned about

---

[5] Throughout the remainder of the Motion, the application for tenure and promotion and the tenure application packet will be collectively referred to as the "Application".

that, she asked if she could only include the "good comments". Exhibit 11, MGMT Sub-Committee Memo, p. 14.  However, the chair ensured that the student comments for the student evaluations submitted were included in the packet. Exhibit 11, MGMT Sub-Committee Memo, p. 4. The application packet was supplemented with Wieland's annual evaluations, her Third, Fourth and Fifth-year progress toward tenure reviews, and all six letters of reference by outside reviewers that were solicited and received by the Department. Email string between Robert Miller and Alice Wieland, dated September 29, 2017, attached hereto as Exhibit 17 and incorporated herein by reference.

Wieland's Application was first reviewed by the MGMT Sub-Committee. The MGMT Sub-Committee reviewed Wieland's teaching, which included the student evaluations, numerical ratings and student comments, her external teaching activities such as student advising, supervision of thesis, supervision of independent studies, and coordination of student activities in professional organizations.  MGMT Sub-Committee Tenure Memorandum, dated October 10, 2017, attached hereto as Exhibit 18 and incorporated herein by reference.  All MGMT Sub-Committee members agreed Wieland's teaching scores were among the lowest ratings they had ever seen and noted that Wieland's teaching performance was consistently and substantially below the mean for the Managerial Sciences Department. *Id.*  The MGMT Sub-Committee acknowledged Wieland had made efforts to improve her teaching effectiveness, including reaching out to senior faculty for mentorship. *Id.*  However, while those efforts resulted in a brief improvement in her teaching in 2014, the MGMT Sub-Committee noted that the course evaluation ratings for 2015 through 2017 decreased and were extremely low at the time she submitted her Application. *Id.*  As a result, the MGMT Sub-Committee gave Wieland an unsatisfactory in teaching and a commendable in research and recommended not to grant tenure. *Id.*

The Department Committee reviewed the Application next and like the MGMT Sub Committee, the Department Committee did not recommend Wieland for promotion or tenure. Exhibit 10, Department Tenure Memo.  The Department Chair agreed with the Department Committee and recommended against tenure and notified Wieland of the recommendation against promotion and tenure. Letter from department chair to Wieland, dated October 25, 2017, attached hereto as Exhibit 19 and incorporated herein by reference. The Department Chair's letter explained to Wieland that she could request reconsideration of this decision pursuant to the NSHE Code.

Exhibit 19, Department Chair letter.

2. <u>Reconsideration Review of Application</u>.

Wieland requested reconsideration of her Application in November of 2017. Wieland Reconsideration Letter, dated November 17, 2017, attached hereto as Exhibit 20 and incorporated herein by reference. Pursuant to the NSHE Code, the request for reconsideration must include the reasons, arguments and documentation supporting the request for reconsideration. Exhibit 1, NSHE Code, Section 5.2.4, p. 15. In making her request for reconsideration, Wieland submitted a lengthy letter asserting the reasons and arguments supporting her request and attached a two-page document concerning student approval data as an appendix to the letter. Exhibit 20, Wieland Reconsideration Letter. Specifically, Wieland's reconsideration request was based upon her claims that inconsistent standards were applied to her Application, the use of student evaluations in the tenure decision were objectionable and there were process violations related to her tenure review. *Id.*

The MGMT Sub-Committee reviewed the reconsideration letter and appendix and on December 5, 2017, provided an evaluation and response to the arguments raised in Wieland's reconsideration letter. Exhibit 11, MGMT Sub-Committee Memo. The MGMT Sub-Committee noted Wieland's teaching was an area of concern as identified in the third, fourth and fifth-year review letters. Exhibit 11, MGMT Sub-Committee Memo, pp. 2-3. Additionally, the MGMT Sub-Committee noted that in each of the key dimensions of the student evaluations (overall quality of courses, overall quality of teaching), about 24 to 28% of the students in her classes were rating her teaching as 0-1 on a scale of 1 to 4. Exhibit 11, MGMT Sub-Committee Memo, p. 6. The MGMT Sub-Committee found that the one-quarter to almost one-third of her students rating her so low was unacceptable. *Id.* The MGMT Sub-Committee also noted that if there was a gender bias in student evaluations, then all female instructors would have similar low student evaluations and this was not the case. Exhibit 11, MGMT Sub-Committee Memo, p. 5.

The MGMT Sub-Committee also addressed Wieland's research. The MGMT Sub-Committee noted that none of Wieland's publications have been in the number one or number two journals in her areas of research. Exhibit 11, MGMT Sub-Committee Memo, p. 9. The MGMT Sub-Committee stood by its comments that the external reviewers' opinions were mixed, given that only two out of six reviewers said that she would receive tenure at their school. *Id.* The voting

members of the MGMT Sub-Committee, by unanimous decision, did not recommend Wieland for tenure. Exhibit 11, MGMT Sub-Committee Memo.

On reconsideration, the Department Committee voted 4-3 in favor of tenure, with the three members from Wieland's management department recommending against tenure and two members outside of the management department who had two proxy votes (ie. two members with a total of 4 votes) recommending tenure. Department Committee Reconsideration Memorandum, dated January 18, 2018, attached hereto as Exhibit 21 and incorporated herein by reference. The department chair reversed his prior decision of recommending against tenure, stating he would go along with the majority vote of the Department Committee. Department Chair Reconsideration Letter, dated January 22, 2018, page 4, attached hereto as Exhibit 22 and incorporated herein by reference.

The reconsideration review then went to the College Academic Personnel Committee ("College Committee)". The College Committee, which has members outside of the Department of Managerial Sciences, were all present and voted 4-1 to overturn the department chair's recommendation and rate Wieland as unsatisfactory in teaching and commendable to excellent in research. College Committee Reconsideration Letter, dated January 23, 2018, attached hereto as Exhibit 23 and incorporated herein by reference. In making its recommendation, the College Committee gave the opinion and reasoning of the faculty from the management area more weight since they were best qualified to evaluate Wieland's research and teaching and the goals of the management area would be most impacted by the tenure decision. Exhibit 23, College Committee Memo.

The dean of the College of Business concurred with the College Committee and recommended against tenure. Dean's Reconsideration Memorandum, dated January 24, 2018, attached hereto as Exhibit 24 and incorporated herein by reference. The dean stated Wieland's shortcomings were regularly noted in her evaluations with consistent reminders of the need to improve, her numerical scores in the student evaluations were consistently extremely low and the student comments also showed a high degree of antipathy toward Wieland's teaching. *Id.* Consistent with NSHE Code Section 3.1.2, the dean looked at the body of the work done by Wieland and the potential or lack of potential for her trajectory for success as a teaching professor at the University. The dean gave Wieland an unsatisfactory rating in teaching and a commendable

12

1   rating in research and did not recommend Wieland for tenure. *Id.*

2       The reconsideration evaluation then went to the University Promotion and Tenure

3   Committee ("University Committee").  The University Committee voted 10-1 to not recommend

4   Wieland for tenure. Exhibit 12, University Committee Memo, p. 3.  With respect to teaching, the

5   University Committee noted the majority of negative student comments were not about Wieland's

6   personality, but her organization, changing expectations in the middle of the semester, unclear

7   guidelines for assignments and lack of respect and the committee noted these student comments

8   were made consistently across courses and academic years. *Id.* With respect to research, the

9   University Committee noted that of the six external letters, most were favorable, but at least three

10  noted that she is not publishing in top journals and that her citation counts are low. Exhibit 12,

11  University Committee Memo, p. 1.  The committee also noted her most recent paper in

12  Organization Research Management was in a top tier journal, but only one letter explicitly stated

13  support for tenure. *Id.*

14      The University provost concurred with the recommendations of the College Committee, the

15  dean, and the University Committee and recommended against tenure as Wieland did not meet the

16  criteria for tenure. Provost Reconsideration Letter, dated January 30, 2018, attached hereto as

17  Exhibit 25 and incorporated herein by reference. The University President concurred with the

18  recommendations of the College Committee, University Committee, dean and Provost's denial of

19  Wieland's application for promotion and tenure. President Marc Johnson's Letter to Wieland,

20  dated February 9, 2018, attached hereto as Exhibit 26 and incorporated herein by reference.

21      3. Grievance Review

22      Wieland sought a third level of review and filed a grievance against the dean, challenging

23  the decision to deny Wieland's tenure and promotion, and also against the chair of the College

24  Committee for allegedly violating University bylaws when assessing the tenure application and

25  recommending that tenure be denied. Wieland's Grievance Letter, dated February 23, 2018,

26  attached hereto as Exhibit 27 and incorporated herein by reference. Wieland claimed the College

27  Committee violated University bylaws by giving "extra weight" to the opinion of the MGMT Sub-

28  Committee, although nothing in the bylaws prohibits the College Committee from deliberating or

deciding on such a basis. Exhibit 27, Wieland's Grievance Letter; *see also* Exhibit 6, College of

Business bylaws.   Wieland also claimed that the College Committee and dean violated the

University bylaws when giving directions to review her tenure packet "de novo", although the NSHE Code and various bylaws requires that her body of work and future trajectory be considered in evaluating her Application. Exhibit 27, Wieland Grievance Letter, pp. 3-4; see also Exhibit 1, NSHE Code, NSHE Code Section 3.1.2, p. 5.

The grievance committee reviewed the documentation provided and considered the testimony of Wieland, the dean and the College Committee chair, and supporting witnesses. Grievance Committee Letter to President Marc Johnson, dated April 30, 2018, attached hereto as Exhibit 28 and incorporated herein by reference.  After considerable and careful deliberation, the grievance committee unanimously voted not to support Wieland's requested remedy of promotion and tenure. *Id.*

In total, Wieland had no less than three levels of review by numerous committees and personnel that considered Wieland's Application and considered any discrepancies or bias by committees or personnel as alleged by Wieland. Wieland's claims were not substantiated and Wieland's employment with the University was terminated.

**E.  Undisputed Facts Material to Count 4 and 5 - Retaliation Claims.**

After the department chair informed Wieland that she was not being recommended for tenure, Wieland filed a Title IX complaint against Dr. Rafik Beekun ("Beekun"), Dr. Bret Simmons ("Simmons") and Dr. Yvonne Stedham ("Stedham"), three of the members of the MGMT Sub-Committee who recommended against tenure, alleging gender, age and race discrimination and hostile work environment. Title IX Claim filed November 7, 2017, attached hereto as Exhibit 29 and incorporated herein by reference.

On December 5, 2017, the MGMT Sub-committee issued its recommendation on reconsideration of Wieland's tenure application to the Department Chair, electing again to recommend against tenure. Exhibit 11, MGMT Sub-Committee Memo.

On January 22, 2018, more than six weeks after the MGMT Sub-Committee had recommended against tenure on reconsideration, the Title IX Office informed Simmons and Stedham separately that Wieland had filed a complaint against them. Letter from EO/Title IX office to Simmons, dated January 22, 2018, attached hereto as Exhibit 30 and incorporated herein by reference; Letter from EO/Title IX office to Stedham, dated January 22, 2018, attached hereto as Exhibit 31.  Similarly, on January 30, 2018, the Title IX Office informed Beekun that Wieland had

filed a complaint against him. Letter from EO/Title IX office to Beekun, dated January 30, 2018, attached hereto as Exhibit 32 and incorporated herein by reference. In sum, Beekun, Simmons and Stedham were not aware of Wieland's Title IX complaint until three months after they had already recommended against tenure originally and six weeks after they repeated that same recommendation on Wieland's reconsideration request.  With respect to Wieland's retaliation claim against the dean, Wieland initially claimed that Dean Greg Mosier ("Mosier") retaliated against her by implying that she was a troublemaker when he defended himself at the grievance hearing brought by Wieland against Mosier for the denial of her Application. Title IX Claim filed on May 16, 2018, attached hereto as Exhibit 33. However, during her deposition, Wieland admitted that Mosier should not have been included in the Count 5 retaliation claim based upon her filing a claim with Title IX. Exhibit 3, Wieland Depo, p. 203. Wieland also admitted to Title IX that she did not have a national origin claim and that she did not believe that "ethnic discrimination is a factor in [her] case for any of the people involved…." Email from Wieland to Title IX, dated February 24, 2018, attached hereto as Exhibit 34 and incorporated herein by reference.

On February 8, 2018, Wieland filed a complaint with the Nevada Equal Rights Commission ("NERC"), EEOC Claim No. 34B-2018-00156, alleging sex and age discrimination against the University under Title VII of the Civil Rights Act of 1964, the ADEA of 1967 and the Nevada Revised Statutes. NERC Complaint, attached hereto as Exhibit 35 and incorporated herein by reference.  In July of 2018, Wieland amended her NERC Complaint, alleging sex, age and national origin discrimination against the University under Title VII of the Civil Rights Act of 1964, the ADEA of 1967 and the Nevada Revised Statutes. NERC Amended Complaint, attached hereto as Exhibit 36 and incorporated herein by reference. Wieland did not make a claim for retaliation against the University in either the NERC Complaint or NERC Amended Complaint. Exhibit 35, NERC Complaint and Exhibit 36, NERC Amended Complaint. The stated last date of any alleged discrimination for both the NERC Complaint and NERC Amended Complaint was November 05, 2017. *Id.*

Wieland alleged generally in her Complaint that she filed her lawsuit within 90 days after the EEOC issued its "Dismissal and Notice of Rights" for EEOC Claim No. 34B-2018-00156. Complaint, ¶ 9. The Dismissal and Notice of Rights letter for EEOC Claim No. 34B-2018-

00156, was dated September 11, 2019. Dismissal and Notice of Rights letter for EEOC Claim No. 34B-2018-00156, attached hereto as Exhibit 37 and incorporated herein by reference. Wieland never filed a retaliation claim with NERC or the EEOC and the time for filing such a claim has expired.

### III.   STANDARD OF REVIEW

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court."*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted).   Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "A principal purpose of summary judgment is 'to isolate and dispose of factually unsupported claims.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of showing that there are no genuine issues of material fact for trial. It can do this by: (1) presenting evidence to negate an essential element of the nonmoving party's case; or (2) demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–325.

Once the moving party satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *See, Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).   The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists,"  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank*

*of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).   But if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.   The court "need not automatically accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations in the form of factual allegations."  *U.S. v. Real Prop. Located at 9832 Riceon Ave.,* 234 F.Supp.1136, 1137 (C.D. Cal. 2002).   Sweeping conclusory allegations will not suffice to defeat a motion for summary judgment, nor will unwarranted inferences.  *Ove v. Guinn*, 264 F.3d 817, 822 (9th Cir. 2003); *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir. 1988). "[I]f evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).   "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

## IV.    LEGAL ANALYSIS

### A.    Count 1 Fails as a Matter of Law Because the ADEA is The Exclusive Remedy for Age Discrimination.

Count 1 of Wieland's Complaint alleges discrimination on the basis of age in violation of the ADEA, 29 U.S.C. § 621 et seq. See Complaint ¶¶ 49 to 53.   Summary judgment is warranted on this claim since the ADEA cannot be a basis for a claim against NSHE.   The ADEA is the exclusive federal remedy for age discrimination.  *Ahlmeyer v. Nevada System of Higher Education*, 555 F.3d 1051, 1060–61 (9th Cir.2009) ("We hold the ADEA is the exclusive remedy for claims of age discrimination in employment, even those claims with their source in the Constitution.").   The ADEA does not abrogate a State's sovereign immunity, making state institutions like NSHE immune from lawsuits under the ADEA. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000).   Furthermore, the State's sovereign immunity under the Eleventh Amendment applies to actions seeking monetary relief and actions seeking equitable relief.  *See, Petzak v. Nevada ex rel. Dep't of Corrections,* 2010 WL 11594973, at *3 (D.Nev. 2010), citing *Alabama v.* Pugh, 438 U.S. 781, 781 (1978).

Moreover, even if Wieland attempted to amend her Complaint to allege a claim for age discrimination under state law pursuant to NRS 613.310 to NRS 613.435, NRS 613.430 requires any suit filed pursuant to NRS 613.420 to be filed within 180 days of the alleged

unlawful act or 90 days after receipt of the right-to-sue notice, with the time period being tolled during the pendency of any complaint filed with the EEOC. Wieland's Dismissal and Notice of Rights letter for Wieland's EEOC Claim No. 34B-2018-00156, was dated September 11, 2019. Exhibit 37, Dismissal and Notice of Rights letter for EEOC Claim No. 34B-2018-00156. More than 90 days have elapsed since September 11, 2019. Therefore, Wieland is time barred from bringing a claim for age discrimination under federal and state law.

**B.      Count 2 Fails as a Matter of Law as there is No Evidence that Sex Discrimination Occurred.**

Wieland alleges she was denied tenure "in violation of Title VII, which prohibits sex discrimination." *See* Complaint at ¶ 56. More specifically, Wieland alleges she was "treated differently than men" in her denial of tenure. Exhibit 3, Wieland Depo at 191:3-4. However, there is no evidence to support this claim for sex discrimination.

Title VII of the Civil Rights Act of 1964 prohibits sex discrimination in the workplace. *Switzer v. Rivera*, 174 F. Supp. 2d 1097, 1103 (D. Nev. 2001). Wieland may establish a prima facie case of sex discrimination by demonstrating disparate treatment as between men and women. *Candelore v. Clark Cty. Sanitation Dist.*, 752 F. Supp. 956, 960 (D. Nev. 1990), aff'd, 975 F.2d 588 (9th Cir. 1992).

When a plaintiff lacks direct evidence of discriminatory intent, they must typically navigate the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), which involves circumstantial evidence of intent. Because direct evidence of discriminatory intent is rare, and in this case, non-existent, Wieland must produce circumstantial evidence, i.e., comparator evidence, to prove the requisite discriminatory intent. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring). This is commonly done by pointing to comparator evidence purporting to show a plaintiff was treated less favorably than a "similarly situated" individual outside the plaintiff's protected class. *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 72 (1st Cir. 2004) (recognizing that circumstantial evidence offered by an employment discrimination plaintiff might include "evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence"); *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719-20 (4th Cir. 2013) (examining the federal courts' reliance on comparator evidence in discrimination cases).

The *McDonnell Douglas* test first requires a plaintiff to establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The precise requirements of the prima facie case vary, depending on the type of adverse employment action at issue. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 506 (2002) (noting that "the precise requirements of the prima facie case can vary with the context and were 'never intended to be rigid, mechanized, or ritualistic'").

If a plaintiff establishes a prima facie case of discrimination, a rebuttable presumption of unlawful discrimination arises. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983). The burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its adverse employment action, which it must do to avoid liability. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254. If the defendant carries its burden, the presumption of unlawful discrimination generated by the prima facie case "drops from the case." *See Burdine*, 450 U.S. at 256 (explaining that "the employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons'") and *id.* at 255 n.10. At that point, the burden shifts back to the plaintiff to prove as a factual matter that she suffered unlawful discrimination, which may be accomplished with evidence that the defendant's nondiscriminatory explanation is merely a pretext for the employer's real reason: intentional and unlawful discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 804; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 & 517 (1993); *Flowers v. Troup Cty., Ga.*, 803 F.3d 1327, 1339 (11th Cir. 2015) (recognizing that a plaintiff may not survive summary judgment by "merely contradicting the [defendant's] proffered legitimate, nondiscriminatory reason;" rather, the plaintiff must still provide sufficient evidence that the employer's action was discriminatory). Thus, although the burden of production shifts back and forth, the burden of persuading the factfinder that the defendant intentionally discriminated against the plaintiff remains at all times, and in the final analysis, with the plaintiff. *Burdine*, 450 U.S. at 253.

Wieland testified in her deposition that she has no direct evidence that gender was discussed or given as a reason to deny her tenure. *See* Exhibit 3, Depo at 191:15-23. Similarly, Wieland has not produced direct evidence of discrimination in discovery. To survive summary judgment, Wieland must therefore produce comparator evidence demonstrating that she was

19

treated less favorable than "similarly situated" men seeking tenure. *E.g., Rathbun,* 361 F.3d at 72.

Wieland claims she was treated differently than if she were a man and further claims that Beekun, Simmons, Igor Makienko, and Greg Stone, all male professors who were granted tenure prior to the year she applied for tenure, presently were not great researchers or had not published anything after being granted tenure. See id. at 122:16-123:8. Exhibit 3, Wieland Depo at 122:10-123:9, 191:21-22.  Wieland's allegations are baseless and not supported by the facts.

These four professors were granted tenure prior to the year Wieland applied for tenure,. Exhibit 3, Wieland Depo at 122:10-123:9, 191:21-22.  These men therefore, are not similarly situated as they were not going up for tenure or promotion the same year as Wieland would not need to meet same research or teaching output that she needed to meet in order to demonstrate her effectiveness in research and teaching to be granted tenure and all the privileges that come with it.  As stated above, tenure-eligible employees must demonstrate excellent abilities in teaching or research during their probationary period and if they do not demonstrate these qualities, they do not get tenure and are terminated.  Exhibit 1, NSHE Code, Section 3.3.4, p. 8. Conversely, once a faculty member has obtained tenure they have no obligation to apply for further advancement or promotion to remain a faculty member at the University.  Exhibit 6, College of Business bylaws, Section 7.5, p. 10. As such, tenured faculty are under no obligation to produce a certain level or quality of research or have certain student ratings to remain a tenured faculty member.  Wieland acknowledged this dichotomy between non-tenured faculty and tenured faculty, as stated by one of Wieland's students in an evaluation: "She also talks about how she does not care about how well she teaches the class because she is 'so close to being tenured that it wont [sic]matter how awful I teach, they wont [sic] be able to get rid of me.'" Exhibit 15, Tenure Application, p. 276.

Additionally, there were two other similarly situated female professors who applied for tenure in the College of Business at the same time as Wieland.  Notwithstanding Wieland's discrimination claims, the University awarded both of them tenure.  Exhibit 38, NERC Findings Letter, pp. 2-3.  Like Wieland, both were female.  Unlike Wieland, both achieved the requisite ratings in teaching and research to be eligible for tenure.  Wieland has not produced

1  any evidence to show that any other similarly situated female professor who received student

2  evaluations as negative and as consistently as the ones Wieland received were granted tenure.

3  *Id.*  In short, Wieland cannot substantiate her claim that she was discriminated against based

4  upon gender.

5  **C.    Count 3 Fails as a Matter of Law as There is No Evidence That**

6  **National Origin Discrimination Occurred.**

7  Wieland alleges she "was denied tenure in violation of Title VII based on her national

8  origin." *See* Complaint at ¶ 60.  More specifically, Wieland alleges she was discriminated

9  against because of her Hispanic origin and the fact that two other women who went up for

10  tenure at the same time as her were of Asian origin and granted tenure is evidence of

11  discrimination.  Exhibit 3, Wieland Depo at 195:25-196:18.

12  "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice

13  for an employer ... to discriminate against any individual with respect to [their] compensation,

14  terms, conditions, or privileges of employment, because of such individual's race, color,

15  religion, sex, or national origin.'" *Lo v. Verizon Wireless LLC*, 2015 WL 3603726, at *3 (D.

16  Nev. June 8, 2015).  The same *McDonnell Douglas* burden shifting analysis for Count 2,

17  discussed above, applies to Count 3.

18  Wieland cannot make out a prima facie case of national origin discrimination.  Wieland

19  testified in her deposition that she does not have any direct evidence of discrimination based

20  upon national origin. Exhibit 3, Wieland Depo, at 200:1-10.  Wieland also admitted, after her

21  tenure denial, and during her Title IX complaint process, that "no one can tell" she is of

22  Hispanic origin and that she does not believe ethnic discrimination was a factor for "any of the

23  people involved" in her tenure denial:

24  Wieland also admitted, after her tenure denial, and during her Title IX complaint

25  process, that "no one can tell" she is of Hispanic origin and that she does not believe ethnic

26  discrimination is a factor in her case for "any of the people involved" in her tenure denial, as

27  follows:

28  "I do not remember filing Ethnic discrimination charges because no one can tell

I'm of Hispanic descent. Can you double check your notes on this? I do not

believe ethnic discrimination is a factor in my case for any of the people involved

1    – only gender and possibly, age. I have withdrew [sic] the complaint for gender

2    discrimination for Yvonne [Stedham] already."

3    *See* Exhibit 34, Email from Wieland to Title IX, dated February 24, 2018.   Despite

4    admitting national origin was not a factor in her tenure denial, Wieland now argues it was a

5    factor because two other Asian women were granted tenure at the same time she was not

6    granted tenure.   However, as also stated above, Wieland fails to demonstrate how these Asian

7    women were similarly situated and how she was treated differently from them.   Ultimately,

8    Wieland's allegations are not evidence that Wieland was discriminated against because of her

9    national origin.

10        In sum, Wieland has no evidence of any discriminatory animus against persons of

11   Hispanic origin, and certainly no evidence that any national origin discrimination played a role

12   in her denial of tenure and ultimate termination.

13   **D.    Count 4 and Count 5 Should Be Dismissed as Wieland Has Failed**
14   **       To Exhaust Her Administrative Remedies and As a Matter of Law, She**
             **Cannot Support Her Retaliation Claims.**
15        Wieland's Complaint loosely alleges a retaliation claim under the ADEA in alleged in

16   Count 4 of her Complaint that she engaged in protected activity within the meaning of the

17   ADEA when she filed a Title IX complaint alleging discrimination and her denial of tenure was

18   a result of her opposition to a practice made unlawful by the ADEA. Complaint ¶¶ 63 and 64.

19   Similarly, Wieland's Complaint loosely alleges a retaliation claim under Title VII in Count V

20   Wieland alleged that she engaged in protected activity within the meaning of Title VII when

21   she filed Title IX complaints for discrimination against Beekun, Simmons, Stedham and

22   Mosier. Complaint ¶¶ 67 and 68.   Specifically, Wieland has claimed that her retaliation

23   claim against Beekun, Simmons and Stedham was based upon these members of the MGMT Sub-

24   Committee denying her request for reconsideration on December 5, 2017. Title IX Claim filed

25   on January 11, 2019, attached hereto as Exhibit 39 and incorporated herein by reference.[6]   In

26   

27   _____

28   [6] With respect to Wieland's retaliation claim against the dean, Wieland initially claimed Mosier
     retaliated against her by implying that she was a troublemaker when he defended himself at the
     grievance hearing brought by Wieland against Mosier for the denial of her tenure application.
     Title IX Claim filed on May 16, 2018, attached hereto as Exhibit 390 and incorporated herein by
     reference. However, during her deposition, Wieland admitted that Mosier should not have been

                                                   22

1    other words, Wieland claims that the MGMT Sub-Committee would have necessarily granted

2    her reconsideration request and awarded her tenure, just weeks after it previously

3    recommended against tenure, but for the Title IX complaint she filed against these three

4    members of the MGMT Sub-Committee.

5        "To file suit for a Title VII, ADA, or ADEA claim, a plaintiff must first timely file a

6    charge of employment discrimination with the EEOC." *Kennedy v. Columbus Mfg., Inc.,* Case

7    No. 17-CV-03379-EMC, 2017 WL 4680079, at *2 (N.D.Cal. Oct. 18, 2017).  "Plaintiff was

8    required to exhaust her administrative remedies." *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091,

9    1099 (9th Cir. 2002), *as amended* (Feb. 20, 2002). In determining whether a plaintiff has properly

10   exhausted her administrative remedies, the Court must construe EEOC charges with liberality,

11   and "the crucial element of a charge of discrimination is the factual statement contained therein."

12   *Id.* at 1100 (citation omitted).  But "[a]llegations of discrimination not included in the plaintiff's

13   administrative charge may not be considered by a federal court unless the new claims are like or

14   reasonably related to the allegations contained in the EEOC charge." *Id.* (internal quotation

15   marks and citations omitted).  The purpose of the exhaustion requirement is to give Defendant

16   notice of Plaintiff's claim, and to narrow the issues for prompt adjudication. *See id.* at 1099.

17       Wieland's NERC Complaint, EEOC Claim No. 34B-2018-00156, alleged sex and age

18   discrimination against the University under Title VII of the Civil Rights Act of 1964, the

19   ADEA of 1967 and the Nevada Revised Statutes. Exhibit 35, NERC Complaint. Wieland's

20   Amended NERC Complaint, EEOC Claim No. 34B-2018-00156, alleged sex, age and

21   national origin discrimination against University under Title VII of the Civil Rights Act of

22   1964, the ADEA of 1967 and the Nevada Revised Statutes. Exhibit 36, NERC Amended

23   Complaint. Wieland did not make a claim for retaliation under the ADEA or Title VII

24   against University in either the NERC Complaint or NERC Amended Complaint. Exhibit

25   35, NERC Complaint and Exhibit 36, NERC Amended Complaint.  In fact, there are no

26   factual statements in the NERC Complaint or the NERC Amended Complaint regarding

27   Wieland's retaliation claims.  Instead, the allegations in Wieland's NERC Complaint or

28   NERC Amended Complaint are about the use of student ratings and evaluations in tenure

---

included in the Count 5 retaliation claim based upon her filing a claim with Title IX. Exhibit 3,
Wieland Depo, p. 203.

decisions, which Wieland believes are biased against women and that their use is discriminatory and has a disparate impact on women. Wieland's NERC Complaint and NERC Amended Complaint also alleged that Beekun and Simmons had a discriminatory animus toward women and Wieland believed that she was denied tenure for not complying with stereotypical gender norms or because of her age. Exhibit 35, NERC Complaint and Exhibit 36, NERC Amended Complaint.

Furthermore, Wieland only checked the boxes for "Sex" and "Age" in the NERC Complaint and "Sex", "Age" and "National Origin" in the NERC Amended Complaint. Id. The closing letter from NERC only addressed the claims of sex, age and national origin, also indicating that Wieland did not make a claim for retaliation. NERC Findings Letter, dated August 9, 2019, attached hereto as Exhibit 38 and incorporated herein by reference. In short, Wieland provided no notice that she was making any claim for retaliation. Because Wieland failed to exhaust her administrative remedies regarding her two retaliation claims, Count 4 and Count 5 should be dismissed.

Even if Wieland had filed the retaliation claims with the NERC or the EEOC, Wieland cannot factually or as a matter of law sustain her retaliation claims. Wieland filed a Title IX complaint against Beekun, Simmons and Stedham, a few of the members of the MGMT Sub-Committee, alleging gender, age and race discrimination and hostile work environment. Exhibit 29, Title IX Claim filed November 7, 2017. Wieland has claimed that the retaliatory act was the issuance of the recommendation made on reconsideration by the MGMT Sub-Committee, issued on December 5, 2017. Exhibit 39, Title IX Claim filed on January 11, 2019. But the recommendation made by the MGMT Sub-Committee on reconsideration did not change from the recommendation the MGMT Sub-Committee made in its initial review on October 15, 2017. See Exhibit 18, MGMT Sub-Committee Tenure Memorandum, dated October 10, 2017; Exhibit 14, MGMT Sub-Committee Memo. Mosier was not involved in and did not participate in the December 5, 2017 recommendation. Exhibit 14, MGMT Sub-Committee Memo. In effect, Wieland claims that the MGMT Sub-Committee would have necessarily reversed its decision from a month earlier and recommended tenure based upon Wieland's reconsideration request, but instead recommended against tenure to retaliate against her for filing a Title IX complaint.

The problem with Wieland's claim of retaliation is that Beekun, Simmons and Stedham did not know about Wieland's Title IX complaint filed against them until after the MGMT Sub-Committee issued the recommendation on reconsideration against tenure.   Simmons and Stedham were notified on January 22, 2018 about the Title IX Complaint and Beekun was notified on January 30, 2018 about the Title IX Complaint.  See, Exhibits, 31, 32 and 33.  As such, even if the retaliatory claims were not barred by Wieland's failure to exhaust her administrative remedies, the undisputed facts demonstrate that Wieland cannot sustain the Count 4 and Count 5 retaliation claims as a matter of law.

**E.     Count 6 Fails Because Wieland's Denial of Tenure Was a Discretionary Decision That Did Not Breach Any Contractual Implied Covenant of Good Faith and Fair Dealing.**

Wieland's Count 6 alleges NSHE breached the contractual implied covenant of good faith and fair dealing. *See* Complaint at ¶¶ 70-78.  To establish a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the plaintiff's justified expectations under the contract were denied. *See Perry v. Jordan*, 111 Nev. 943, 900 P.2d 335, 338 (1995) (citing *Hilton Hotels Corp. v. Butch Lewis Prod. Inc.*, 107 Nev. 226, 808 P.2d 919, 922–23 (1991).

For the first element, it is undisputed Wieland had an employment contract with the NSHE for the position of assistant professor at UNR, which was a "tenure eligible" position, meaning the position could have led to tenure but tenure was not guaranteed.  *See* Section II(1), *supra*.  In fact, Wieland's contract stated that if she did not obtain tenure within a seven-year probationary period, she would not be reappointed and would be terminated from employment. *See* Exhibit 1, NSHE Code, Sections 3.3.

Regarding the second element, without pointing to any specific contractual provision and without any evidence to support the allegation, Wieland contends the University breached the covenant of good faith and fair dealing because the tenure review process was "unfair and biased", was "tainted by multiple material misrepresentations of the Plaintiff's work", and was "tainted by reckless or intentional procedural violations". *See* Complaint at ¶¶ 70-78. However,

the evidence in this case clearly demonstrates Wieland's tenure review process was exhaustive, and that there was no discriminatory motive in the recommendations or decision to deny tenure. Wieland has failed to bring forth any evidence of any bias, misrepresentations or reckless or intentional violations of her contract. Wieland simply did not meet the requirements for tenure.

Regarding the third element, Wieland's justified expectations were not denied. As a matter of law, Wieland had no contractual right to tenure as University's decision to grant or deny tenure was "completely discretionary." *Univ. of Nevada, Reno v. Stacey*, 116 Nev. 428, 432, 997 P.2d 812, 814 (2000). Indeed, "a university's decision to grant tenure is a discretionary exercise of judgment that should not be actionable unless arbitrary or unconstitutional." *Stacey*, 116 Nev. at 434, 997 P.2d at 815 (citing *Harrison v. Goldstein*, 204 A.D.2d 451, 611 N.Y.S.2d 623 (N.Y.App.Div.1994); *Coe v. Board of Regents*, 140 Wis.2d 261, 409 N.W.2d 166 (1987); *Goodisman v. Lytle*, 724 F.2d 818 (9th Cir.1984). Wieland knew that tenure was not guaranteed. Exhibit 3, Depo. p. 50, ll. 17-19. Wieland knew her teaching was problematic and in fact, by the time Wieland applied for tenure, her teaching evaluations had declined. Exhibit 11, MGMT Sub-Committee Memo, p. 3. Wieland was well aware of her teaching deficiencies and admitted that her tenure case was marginal because of her poor teaching ratings. Exhibit 16, Wieland's journal entry dated March 5, 2018. The conditions for tenure require a faculty member committed to excellence sufficient to convince the University that the faculty member's performance in the future would justify the privileges afforded by tenure. Exhibit 1, NSHE Code, Section 3.1.2, p. 13. In Wieland's case, her teaching record did not demonstrate an upward future trajectory sufficient to warrant the privilege of tenure.

Since Wieland cannot prove the elements necessary to prevail on a claim for a contractually based breach of the implied covenant of good faith and fair dealing, her claim fails as a matter of law.

**F.   Count 7 Fails as a Matter of Law Because Wieland's Denial of Tenure Did Not Breach Any Tortious Implied Covenant of Good Faith and Fair Dealing.**

Wieland's Count 7 alleges a tortious breach of implied covenants. Complaint at ¶¶ 79-88. A defendant may be tortiously liable under such a claim only under "'limited circumstances' where the employer-employee relationship approximates the kind of special reliance, trust and dependency that is present in insurance cases' and the employer betrays that

relationship in bad faith." *Andreatta v. Eldorado Resorts Corp.*, 214 F. Supp. 3d 943, 957 (D. Nev. 2016) (citing *D'Angelo v. Gardner*, 107 Nev. 704, 819 P.2d 206, 215 (1991). To determine whether or not such a relationship exists, "[t]he Nevada court[s] look[] for facts such as promise of employment 'until retirement,' lengthy duration of employment, and termination characterized by 'deception,' 'perfidy,' and 'betrayal.'" *Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 336 (9th Cir. 1995) (citation omitted). "This additional tort liability is allowed only in cases where 'ordinary contract damages do not adequately compensate the victim because they do not require the party in the superior or entrusted position ... to account adequately for grievous and perfidious misconduct, and contract damages do not make the aggrieved, weaker, 'trusting' party 'whole.'" *Andreatta*, 214 F. Supp. 3d at 957 (citing *K Mart Corp. v. Ponsock*, 103 Nev. 39, 732 P.2d 1364, 1371 (1987), *abrogated on other grounds by Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)).

Wieland failed to explain or allege the basis of a special relationship. Wieland failed to allege why this simple relationship between a probationary employee and the employer should be elevated to a special relationship. There was no promise of perpetual employment. Rather, Wieland was on probationary status when she was denied tenure. Wieland was never provided with a promise of lengthy employment that generally comes with tenure. As a result, there was no special relationship between the University and Wieland.

Even if there were a special relationship, there is no evidence of deception, perfidy or betrayal in the denial of Wieland's application for tenure. This is a denial of tenure case where Wieland simply did not meet the criteria required for the University's tenured faculty. As a result, Wieland's claim for tort liability for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

**G.      Count 8 Fails as a Matter of Law as There is No Breach of Contract.**

Wieland's Count 8 makes vague and ambiguous allegations that NSHE breached a "contract". *See* Complaint at ¶¶ 89-95. It is assumed Wieland believes her denial of tenure is somehow a breach of contract. Wieland's contract said she was tenure eligible and the Code is part of her contract. As demonstrated above, NSHE followed the Code in evaluating Wieland's Application by considering the three standards of teaching, research and service, applying the ratings to those standards, and basing the tenure recommendations on the criteria or factors

described in the Code and then applying the facts in Wieland's case to the criteria, ratings and standards. Just because Wieland did not like the outcome, it does not demonstrate a breach of her contract.

Moreover, as explained above, the decision to grant tenure is completely discretionary. Indeed, tenure at the University is governed by the NSHE Code, the University bylaws, the College bylaws and the Department bylaws. NSHE Code Section 3.1.2 describes tenure as a discretionary privilege, not a right:

> The major objectives of tenure are to provide a faculty committed to excellence and to provide a substantial degree of security to those persons who have exhibited excellent abilities, sufficient to convince the University of Nevada community that their expected services and performances in the future justify the ***privileges*** afforded by tenure.

Exhibit 1, NSHE Code p. 13 (emphasis added). In addition, Section 7.2 of the bylaws of the College of Business indicate the "standards for tenure are established in the NSHE Code." Exhibit 6, College of Business bylaws, p. 9; see also, Section 5.4 of the MGRS bylaws states, "Tenure ***may*** be considered if a qualified applicant is rated 'excellent' in either teaching or research." *See* Exhibit 5, MGRS Department Bylaws, p. 13. (emphasis added).

Based upon the aforementioned discretionary provisions, Wieland was not contractually entitled to tenure. Indeed, the provisions of Wieland's contract negate any theory that tenure was automatic or in any way guaranteed. *See Stacey*, 116 Nev. at 433, 997 P.2d at 815, and instead, provide that the grant of tenure is a privilege and a decision of such import that express criteria is set forth, numerous committees are formed, and numerous levels of review are in place to ensure the privilege of tenure is only given to those committed to excellence, now and into the future. *Id.* Because the contractual provisions concerning tenure clearly require the exercise of discretion and subjective decision making, the University is entitled to summary judgment because its denial of Wieland's tenure application was not, as a matter of law, a breach of contract.

## V.     CONCLUSION

Based upon the foregoing, Wieland's claims fail as a matter of law.    Accordingly, Defendant NSHE respectfully requests the Court grant summary judgment in its favor and against Plaintiff Wieland.

DATED this 15th day of July, 2022.


_____/s/ Melissa P. Barnard_____
MELISSA P. BARNARD
*Attorney for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of the University of Nevada, Reno, over the age of eighteen years, that I am not a party to the within action, and that on the 15th day of July, 2022, I electronically filed the foregoing **MOTION FOR SUMMARY JUDGMENT**, with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

James P. Kemp, Esq.
Kemp & Kemp
7435 W. Azure Dr., Suite 110
Las Vegas, NV 89130

Thomas J. Gagliardo
Gilbert Employment Law, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910

Gary M. Gilbert
Gilbert Employment Law, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910

    /s/ Pamela L. Stanley
Employee of the University of Nevada, Reno of
the Nevada System of Higher Education

## AFFIDAVIT OF MELISSA P. BARNARD

**STATE OF NEVADA**        )
                                   : ss
**COUNTY OF WASHOE**      )

I, Melissa P. Barnard, do hereby swear under the penalty of perjury that the assertions of this affidavit are true:

1.       I am an attorney admitted to practice before this Court and I am Associate General Counsel for the University of Nevada, Reno and one of the attorneys of record for the University of Nevada Reno in the matter of *Wieland v. Board of Regents of the Nevada System of Higher Education*, Case No. 3:19-Cv-00724, filed in the United States District Court, District of Nevada.

2.       I make this Affidavit in connection with the University's Motion for Summary Judgment. With the exception of those matters stated upon information and belief, I have personal knowledge of each of the matters stated herein and could testify to the same under oath in a court of law if called upon to do so.

3.       The exhibits attached to the Motion for Summary Judgment are true and correct copies of the referenced documents.

4.       Exhibit 1 is a true and correct copy of pages from the Nevada System of Higher Education Code.

5.       Exhibit 2 is a true and correct copy of Alice Wieland's 2012-2013 employment contract.

6.       Exhibit 3 is a true and correct copy of pages of the deposition transcript of Alice Wieland.

7.    Exhibit 4 is a true and correct copy of Alice Wieland's 2016-2017 employment contract.

8.    Exhibit 5 is a true and correct copy of the University of Nevada, Reno Managerial Science Department bylaws.

9.    Exhibit 6 is a true and correct copy of the University of Nevada, Reno College of Business bylaws.

10.    Exhibit 7 is a true and correct copy of the University of Nevada, Reno bylaws.

11.    Exhibit 8 is a true and correct copy of the Department Third Year Review.

12.    Exhibit 9 is a true and correct copy of the Department Four Year Review.

13.    Exhibit 10 is a true and correct copy of the Managerial Sciences Department Memo, dated October 16, 2017 regarding the tenure application.

14.    Exhibit 11 is a true and correct copy of the Management Sub-Committee Memo, dated December 5, 2017, regarding reconsideration of the tenure application.

15.    Exhibit 12 is a true and correct copy of the University Promotion and Tenure Committee Memo, dated January 29, 2018 of Nevada, Reno College of Business bylaws.

16.    Exhibit 13 is a true and correct copy of the Alice Wieland's annual evaluations for the years 2013-2017.

17.    Exhibit 14 is a true and correct copy of an email string between Alice Wieland and Sheri Faircloth, dated from May 1, 2017 to May 2, 2017, regarding Wieland's tire.

18.    Exhibit 15 is a true and correct copy of Alice Wieland's tenure application packet.

19.     Exhibit 16 is a true and correct copy of a journal entry dated March 5, 2018 from Alice Wieland which was produced by Plaintiff in response to Defendant's discovery requests.

20.     Exhibit 17 is a true and correct copy of an email string between Robert Miller and Alice Wieland from September 28, 2017 to September 29, 2017.

21.     Exhibit 18 is a true and correct copy of the Management Sub-Committee Memo, dated October 10, 2017, regarding review of the tenure application.

22.     Exhibit 19 is a true and correct copy of the Managerial Sciences Department Chair Memo, dated October 25, 2017, regarding review of the tenure application.

23.     Exhibit 20 is a true and correct copy of Alice Wieland's request for reconsideration, dated November 17, 2017.

24.     Exhibit 21 is a true and correct copy of the Managerial Sciences Department Memo, dated January 18, 2018, regarding reconsideration of the tenure application.

25.     Exhibit 22 is a true and correct copy of the Managerial Sciences Department Chair Memo, dated January 22, 2018, regarding reconsideration of the tenure application.

26.     Exhibit 23 is a true and correct copy of the College Academic Personnel Committee Memo, dated January 23, 2018, regarding reconsideration of the tenure application.

27.     Exhibit 24 is a true and correct copy of the College of Business dean Memo, dated January 24, 2018, regarding reconsideration of the tenure application.

28.     Exhibit 25 is a true and correct copy of the Provost letter, dated January

3

30, 2018, regarding reconsideration of the tenure application.

29.    Exhibit 26 is a true and correct copy of the letter dated February 9, 2018 from President Marc Johnson to Alice Wieland regarding reconsideration of the tenure application.

30.    Exhibit 27 is a true and correct copy of Alice Wieland's grievance letter, dated February 23, 2018.

31.    Exhibit 28 is a true and correct copy of the Grievance Committee Memo, dated April 30, 2018, regarding Alice Wieland's grievance.

32.    Exhibit 29 is a true and correct copy of the University Title IX Reporting Form dated November 7, 2017 and completed by Alice Wieland.

33.    Exhibit 30 is a true and correct copy of the letter from the University Title IX Office to Bret Simmons, dated January 22, 2018.

34.    Exhibit 31 is a true and correct copy of the letter from the University Title IX Office to Yvonne Stedham, dated January 22, 2018.

35.    Exhibit 32 is a true and correct copy of the letter from the University Title IX Office to Rafik Beekun, dated January 30, 2018.

36.    Exhibit 33 is a true and correct copy of the University Title IX Reporting Form dated May 16, 2018, and completed by Alice Wieland.

37.    Exhibit 34 is a true and correct copy of the email dated February 24, 2018 from Alice Wieland to Darcie Dayton-Wilcox of the University Title Office.

38.    Exhibit 35 is a true and correct copy of the complaint, EEOC 34B-2018-00156, filed by Alice Wieland with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission.

4

39.    Exhibit 36 is a true and correct copy of the Amended Complaint, EEOC 34B-2018-00156, filed by Alice Wieland in February of 2018, with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission.

40.    Exhibit 37 is a true and correct copy of the amended complaint, Dismissal and Notice of Rights letter from the Equal Employment Opportunity Commission, dated September 11, 2019.

41.    Exhibit 38 is a true and correct copy of the closing letter from the Nevada Equal Rights Commission, dated August 9, 2019.

42.    Exhibit 39 is a true and correct copy of the Title IX Reporting Form dated January 11, 2019.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 15th day of July, 2022.

MELISSA P. BARNARD

SUBSCRIBED and SWORN to before me
this 15th day of July, 2022,
by Melissa P. Barnard.

NOTARY PUBLIC in and for said
County and State.

PAMELA L STANLEY
Notary Public, State of Nevada
Appointment No. 06-107185-2
My Appt. Expires Jun 2, 2026

5

*Wieland v. Board of Regents of the Nevada System of Higher Education*
3:19-CV-00724-MMD-CLB

## MOTION FOR SUMMARY JUDGMENT
### INDEX TO EXHIBITS

1. Nevada System of Higher Education Code

2. Alice Wieland 2012-2013 Employment Contract

3. Deposition Excerpts of Alice Wieland taken April 8, 2021

4. Alice Wieland 2016-2017 Employment Contract

5. Department of Managerial Science Bylaws

6. College of Business Bylaws May

7. University of Nevada Reno Bylaws

8. 3rd Year Review

9. 4th Year Review

10. Managerial Sciences Department Memo, dated October 16, 2017

11. Management Sub-Committee Memo, dated December 5, 2017

12. University Promotion and Tenure Committee Memo, dated January 29, 2018

13. Alice Wieland's annual evaluations for the years 2013-2017

14. Email String between Alice Wieland and Sheri Faircloth, dated May 1, 2017 to May 2, 2017

15. Alice Wieland's tenure application packet

16. Journal entry dated March 5, 2018 from Alice Wieland which was produced by Plaintiff in response to Defendant's discovery requests

17. Email string between Robert Miller and Alice Wieland from September 28, 2017 to September 29, 2017

18. Management Sub-Committee Memo, dated October 10, 2017

19. Managerial Sciences Department Chair Memo, dated October 25, 2017

20. Alice Wieland's request for reconsideration, dated November 17, 2017

21. Managerial Sciences Department Memo, dated January 18, 2018

22. Managerial Sciences Department Chair Memo, dated January 22, 2018

23. College Academic Personnel Committee Memo, dated January 23, 2018

24. College of Business dean Memo, dated January 24, 2018

25. Provost letter, dated January 30, 2018

26. Letter dated February 9, 2018 from President Marc Johnson to Alice

27. Alice Wieland's grievance letter, dated February 23, 2018.

28.     Grievance Committee Memo, dated April 30, 2018

29.     University Title IX Reporting Form dated November 7, 2017

30.     Letter from the University Title IX Office to Bret Simmons, dated January 22, 2018.

31.     Letter from the University Title IX Office to Yvonne Stedham, dated January 22, 2018.

32.     Letter from the University Title IX Office to Rafik Beekun, dated January 30, 2018.

33.     University Title IX Reporting Form dated May 16, 2018

34.     Email dated February 24, 2018 from Alice Wieland to Darcie Dayton-Wilcox of the University Title Office.

35.     Complaint, EEOC 34B-2018-00156, filed by Alice Wieland with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission.

36.     Amended Complaint, EEOC 34B-2018-00156, filed by Alice Wieland in February of 2018, with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission.

37.     Dismissal and Notice of Rights letter from the Equal Employment Opportunity Commission, dated September 11, 2019.

38.     Closing letter from the Nevada Equal Rights Commission, dated August 9, 2019.

39.     Title IX Reporting Form dated January 11, 2019.