1

2

3                       UNITED STATES DISTRICT COURT

4                          DISTRICT OF NEVADA

5                              * * *

6 ALICE WIELAND,                       Case No. 3:19-cv-00724-MMD-CLB

7                     Plaintiff,                      ORDER

8

9     v.

10 BOARD OF REGENTS OF THE NEVADA
SYSTEM OF HIGHER EDUCATION,

11                     Defendant.

12

13 **I.   SUMMARY**

14        Plaintiff Alice Wieland brings this employment discrimination and breach of

15 contract action against Defendant Board of Regents of the Nevada System of Higher

16 Education ("NSHE") after it denied Wieland tenure at the University of Nevada, Reno

17 ("UNR"). Before the Court is Defendant's motion for summary judgment. (ECF No. 97

18 ("Motion").)[1] As further explained below, the Court will grant Defendant's Motion as to

19 Wieland's Title VII gender discrimination claim and state-law claims (Claims 2, 6, 7, 8).

20 The Court will dismiss Wieland's four remaining claims without prejudice because

21 Wieland has voluntarily withdrawn them in response to the Motion.[2] (ECF No. 103 at 2.)

22 _____

23      [1]The Court has reviewed Wieland's response (ECF No. 103) and Defendant's
reply (ECF No. 105).

24      [2]Wieland misnumbers her voluntarily withdrawn claims, but the Court understands

25 that Wieland is voluntarily dismissing Claims 1, 3, 4, and 5. (ECF No. 103 at 2.) In its
reply, Defendant notes Wieland's voluntary withdrawal and "requests that the Court

26 dismiss these four claims." (ECF No. 105 at 20.) A plaintiff may not voluntarily withdraw
claims after the defendant has filed a motion for summary judgment without first

27 obtaining leave of the Court. Fed. R. Civ. P. 41(a)(1)(A)(i). Accordingly, the Court
construes Wieland's response as a motion for voluntary dismissal, which the Court now

28 grants. *See* Fed. R. Civ. P. 41(a)(2) (instructing the Court, in granting a plaintiff's motion
for voluntarily withdrawal, to dismiss claims without prejudice unless the order states

## II.     BACKGROUND

The following facts are undisputed unless noted otherwise.

### A.     Defendant's Tenure and Promotion Process at UNR

UNR is a member institution of NSHE, a governmental entity created under the Nevada Constitution that, through its Board of Regents, governs and manages Nevada's public higher education institutions. (ECF Nos. 97 at 3, 97-1 at 4-5.) *See also* Nev. Const. art. 11, § 4. The NSHE Code ("Code")—Title II of the Board of Regents Handbook—"establish[es] the primary organizational structure" of NSHE and its member institutions and "the basic personnel policies for its faculty." (ECF No. 97-1 at 5.) The Code governs the tenure and promotion process for tenure-eligible faculty and is incorporated by reference in faculty employment contracts. (ECF Nos. 97-2 at 2, 104-1 at 2.) As such, the Code's standards and procedures for tenure and promotion govern faculty employment contracts "exclusive of any bylaws or other policies." (*Id.*)

To gain promotion with tenure, a tenure-eligible professor must first submit an application for appointment with tenure ("Tenure File") near the end of a "probationary period" of up to seven years. (ECF No. 97-1 at 15-17.) Under UNR's bylaws and rules, which supplement and augment the Code, a professor's Tenure File is generally first reviewed by a personnel committee within that professor's department. (*Id.* at 17, 19.) The reviewing personnel committee and department chair then issue their respective tenure recommendations to the president of the NSHE institution (*e.g.*, UNR). (*Id.* at 17.) Once the university president receives the department's recommendation in favor of tenure, all "recommendations for appointment with tenure shall be made by the president to the Board of Regents," which "has final authority in making the appointment with tenure" through an "affirmative majority vote." (*Id.*)

---

otherwise). Because "[t]he decision to grant a voluntary dismissal under Rule 41(a)(2) is addressed to the sound discretion of the District Court," the Court grants Wieland's motion for voluntary dismissal and dismisses without prejudice Claims 1, 3, 4, and 5. *Hamilton v. Firestone Tire & Rubber Co., Inc.*, 679 F.2d 143, 145 (9th Cir. 1982).

The Code also prescribes specific tenure and promotion standards that a professor's reviewing committee and supervisors must apply to her Tenure File. These three standards are teaching, research, and service. (*Id.* at 17-19.) "The major objectives of tenure are to provide a faculty committed to excellence and to provide a substantial degree of security to those persons who have exhibited excellent abilities, sufficient to convince the University of Nevada community that their expected services and performances in the future justify the privileges afforded by tenure." (*Id.* at 14.) Tenure and promotion decisions also advance broader social policies in higher education, such as "community engaged teaching," "research, scholarly, creative, or entrepreneurial activity," as well as commitments to "the best interests of the academic community" and to "community engaged interaction with industry, business, government, and other institutions of our society." (*Id.* at 17-18.)

To be eligible for a recommendation for tenure, a professor must receive an "excellent" rating from her peers and supervisors in at least one of the two core standards—teaching and research—and a rating of "satisfactory" or higher in the other of the two core standards. (*Id.* at 17.) Reviewers and recommenders typically consider several sources and factors in evaluating an applicant's performance, including annual departmental reviews, external review letters, and student course evaluations. If an applicant satisfies these standards, the reviewing committee and department chair recommend either granting or denying tenure to the university president, who in turn makes his own tenure recommendation to the Board of Regents. (*Id.*) Notably, a professor's eligibility for tenure under these standards, alone, does not guarantee the ultimate approval of tenure and promotion; such decisions remain discretionary and subject to multiple levels of approval. (*Id.*)

If a professor receives a recommendation against—that is, denying—tenure and promotion, then that professor may request reconsideration. (*Id.* at 24.) The professor must make the request to the department chair, supervisor, or college dean who rendered the negative decision "with the reasons, arguments and documentation

supporting the request for reconsideration." (*Id.*) The university president makes the final decision on the professor's reconsideration request unless the president changes her mind and recommends appointment with tenure. (*Id.*) If that is the case, then the Board of Regents, who has the final say, must nevertheless approve the recommendation. (*Id.*)

### B.   Wieland's Employment and Performance at UNR

Wieland was a tenure-eligible assistant professor in the Managerial Sciences Department of UNR's College of Business from July 2012 until June 30, 2019. (ECF No. 103 at 2.) While a professor, Wieland's workload was structured as a "40/40/20" role, with 40% of her workload devoted to research, 40% devoted to teaching, and 20% devoted to service. (ECF No. 97-12 at 2.) Wieland received annual departmental reviews of her research and teaching performance. In her third-year review, in 2015, the departmental personnel committee identified Wieland's teaching weaknesses and encouraged Wieland to "continue improving her teaching," but concluded it was "cautiously optimistic" about Wieland's progress toward promotion and tenure. (ECF No. 97-8 at 2-3.) In her fourth-year review, the committee concluded that Wieland was "making adequate progress toward tenure." (ECF No. 97-9 at 3.) As for teaching, the committee noted improvement in teaching but lamented that Wieland's "course evaluations are below average for the College and the University." (*Id.* at 2.)

### C.   Wieland's Tenure File Review and Denial of Tenure

Wieland submitted her 329-page Tenure File in July 2017. (*See generally* ECF No. 97-15.) Two departmental committees—the Departmental Personnel Committee and the Management Area Personnel Subcommittee—reviewed Wieland's Tenure File. (ECF No. 97-10 at 2.) One of these committees issued a unanimous recommendation against Wieland's tenure and promotion, and the majority of the other committee also voted against tenure. (*Id.* at 2-3.)

Applying the Code's three mandatory standards—teaching, research, and service—one of these reviewing committees unanimously rated Wieland "commendable" in research, "unsatisfactory" in teaching, and "commendable" in service. (ECF No. 97-10

at 2.) The other committee noted her "upward[ ]" research trajectory, evidenced by recent high-quality journal publications and a recent "Researcher of the Year" award for the College of Business. (*Id.* at 3.) Despite these achievements, this committee still voted against Wieland's tenure and promotion, citing "potential inconsistencies" raised by external review letters and the rest of her Tenure File. (*Id.*)

Dr. Ron Lembke, the Managerial Sciences Department chair, reviewed both committees' evaluations before offering his own recommendation to the dean of the College of Business. (*Id.* at 2.) First, Lembke told the dean he disagreed with the committee's "commendable" rating in research and personally rated Wieland higher, as "excellent," in research. (*Id.* at 3-5.) Nevertheless, Lembke "strongly agree[d]" with the committee's "unsatisfactory" rating in teaching, citing negative student evaluations that "overwhelmingly outnumbered the positive ones." (*Id.* at 6.) In the end, Lembke rated Wieland "excellent" in research, "unsatisfactory" in teaching, and "commendable" in service and agreed with the committees' overall recommendation against tenure. (*Id.* at 7.) The chair thereafter notified Wieland that her request for tenure had been denied, due in pertinent part to her inability to receive a rating of "satisfactory" or higher in teaching, as required under the Code. (ECF Nos. 97-1 at 17, 97-19 at 2.)

**D.    Wieland's Reconsideration Request and Formal Grievance Review**

After denial of tenure, Wieland filed a reconsideration request. (ECF No. 97-20.) Wieland asserted in her request letter that she had been unfairly evaluated, and she disputed the departmental committees' reliance on student evaluations, which she alleged were biased and unreliable. (*Id.* at 2-7.) In January 2018, the 12-member University Promotion and Tenure Committee met to discuss Wieland's reconsideration request. (ECF No. 97-12 at 2-3.) This university-wide committee first compiled and considered the reconsideration decisions of various committees and supervisors in Wieland's department and college. (*Id.* at 3-4.) Two departmental committees reviewing Wieland's request reached different conclusions. One original reviewing departmental committee reiterated their original rankings for all three standards and voted against

tenure. (*Id.* at 3.) The other original departmental committee voted by a four-to-three majority to recommend Wieland for tenure, after four members rated Wieland's teaching "commendable" and three members ranked her "unsatisfactory." (ECF Nos. 97-12 at 3, 97-21 at 5-8.) The College of Business reconsideration committee voted, four to one, against tenure, finding Wieland's teaching unsatisfactory and her research "near the boundary that separates 'commendable' and 'excellent.'" (ECF Nos. 97-12 at 4, 97-23 at 2.) The chair of Wieland's department reiterated his previous "excellent" research rating, but decided to rate Wieland "commendable" in both teaching and service. (ECF No. 97-12 at 3-4.) Lastly, the dean of the College of Business reviewed the three committees' recommendations and ultimately recommended that Wieland's tenure application be denied. (ECF No. 97-24 at 2.)

Taking into account these five recommendations as well as Wieland's Tenure File and reconsideration request, the University Promotion and Tenure Committee unanimously voted against Wieland's tenure and promotion.[3] (ECF No. 97-12 at 4.) In response to Wieland's allegations, the university committee also qualitatively reviewed Wieland's student evaluations. The university committee "noted that there are many positive comments in the qualitative evaluations, and that "the majority of negative comments are not about personality but about organization, changing expectations in the middle of the semester, unclear guidelines for assignments, [and] lack of respect for students." (*Id.*)

After denial of her reconsideration request, Wieland filed a grievance against both the dean and reconsideration committee of the College of Business. (ECF No. 97-27 at 2-5.) Wieland contended that the dean and committee violated the Code and UNR

---

[3]While the university-wide committee has 12 members, only 11 members attended the January 25, 2018 meeting to vote on Wieland's reconsideration request. Of these 11 present members, 10 voted against tenure, no members voted in favor of tenure, and one member abstained. (ECF No. 97-12 at 2, 4.)

bylaws for failing to consider Wieland's annual reviews[4] and giving too much weight to her initial tenure committees' decision against tenure. (*Id.* at 2-3.) The grievance committee thereafter resolved Wieland's grievance.[5]

### E. This Action

Wieland asserts the following eight claims in her complaint: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621; (2) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (3) national origin discrimination in violation of Title VII of the Civil Rights Act of 1964; (4) retaliation in violation of the Age Discrimination in Employment Act; (5) retaliation in violation of Title VII of the Civil Rights Act of 1964; (6) breach of the implied covenant of good faith and fair dealing of the parties' employment contracts; (7) tortious breach of the implied covenant of good faith and fair dealing; and (8) breach of contract. (ECF No. 1 at 10-15.) As noted, the Court grants dismissal of claims 1, 3, 4, and 5.

## III.   DISCUSSION

The Court will address the Motion as it relates to the four claims that have not been dismissed: Claims 2, 6, 7, and 8. For the reasons discussed below, the Court grants the Motion as to these remaining four claims.

### A. Title VII Gender Discrimination Claim[6]

Wieland alleges that gender-discriminatory reasons motivated Defendant's decisions to deny Wieland tenure, both during initial review of her Tenure File and upon

---

[4]Defendant disputes this fact and offers evidence showing that multiple committees considered Wieland's third-, fourth-, and fifth-year annual reviews. (ECF Nos. 97-10 at 3, 97-11 at 5-6.)

[5]Defendant provides a memorandum from the grievance committee to then-UNR President Marc Johnson, which explains that a grievance hearing had occurred and that the committee's findings and recommendations were attached to the memorandum. (ECF No. 97-28 at 2.) However, the exhibit does not include the attached committee findings and recommendations, and the Court cannot find this evidence elsewhere in the record. Regardless, how the grievance was resolved is irrelevant in terms of the Court's ruling on the Motion.

[6]For purposes of this order, the Court uses the terms "sex" and "gender" interchangeably.

reconsideration, in violation of Title VII. Defendant argues that it is entitled to summary judgment on this claim because there is no genuine issue of material fact as to whether discriminatory reasons motivated Defendant's decisions to deny Wieland tenure and reconsideration. For the reasons below, the Court agrees with Defendant.

### 1.    Legal Framework

To show a prima facie case of disparate treatment under Title VII of the Civil Rights Act, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690 (9th Cir. 2017). A plaintiff may establish an inference of discrimination either by satisfying the prima facie elements from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), or, in the alternative, by producing "direct or circumstantial evidence of discrimination demonstrating that a discriminatory reason 'more likely than not motivated' the employer." *Id.* at 691 (citing *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004).

Under the *McDonnell Douglas* framework, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination by showing that: "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Chuang v. Univ. of Cal. Davis Bd. of Trs.*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). When the plaintiff demonstrates her prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by providing a legitimate, non-discriminatory reason for the adverse employment action. *See Reynaga*, 847 F.3d at 691 (citation omitted); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Despite its utility as a framework, the Court recognizes that "nothing compels the parties to use the *McDonnell Douglas* framework." *Reynaga*, 847 F.3d at 691 (citing *McGinest*, 360 F.3d at 1122); *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) (citing *U.S. Postal Serv. Bd. v. Aikens*, 460 U.S. 711, 717 (1983)).

In this case, the parties appear to rely on different legal frameworks in arguing whether Wieland establishes a prima facie case of gender discrimination under Title VII. In its Motion and reply, Defendant relies exclusively on the *McDonnell Douglas* framework. As for Wieland, it is unclear which legal framework she asks the Court to apply. Wieland invokes and blends two legal frameworks; she briefly cites the *McDonnell Douglas* burden-shifting framework but appears to adopt the *Metoyer* framework, which requires production of circumstantial evidence showing that a discriminatory reason likely motivated Defendant's decision to deny Wieland tenure. (ECF No. 103 at 13-14, 18-23.) *See also Reynaga*, 847 F.3d at 691 (quoting *Metoyer*, 504 F.3d at 931). Because "when responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case," the Court will construe Wieland's response as a rejection of the *McDonnell Douglas* framework and rather an adoption of the *Metoyer* circumstantial-evidence approach. *McGinest*, 360 F.3d at 1122; *see also Costa*, 299 F.3d at 855. That is, the Court will determine whether Wieland defeats summary judgment by "produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [Defendant]." *Reynaga*, 847 F.3d at 691.

## 2.    Circumstantial Evidence of Gender Discrimination

To start, Wieland conceded in her deposition testimony that she has no direct, "hard-and-fast evidence" that gender was the reason driving Defendant's denial of tenure. (ECF No. 97-3 at 5.) As for circumstantial evidence of gender discrimination, Wieland offers very little evidence that the Court can consider at the summary judgment stage. For example, Wieland offers a self-made table in her response that compares Wieland's research performance with those of four male professors granted tenure in UNR's College of Business. (ECF No. 103 at 18-19.) To authenticate and support this comparator evidence, Wieland provides her own affidavit, in which she contradicts the contents of her own Tenure File, denies Defendant's allegations, or makes conclusory, speculative, and uncorroborated statements. (*Id.* at 90-91.)

Because a nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), the Court finds that Wieland's affidavit is insufficient to create a genuine issue of material fact as to whether "a discriminatory reason more likely than not motivated" Defendant's decision to deny Wieland tenure. *Reynaga*, 847 F.3d at 691 (citations omitted); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a genuine issue where the only evidence presented is 'uncorroborated and self-serving testimony.'") (quotations and citations omitted); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) (finding that a plaintiff-appellant relying on her own affidavit to establish she did not understand a waiver was "a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence" and thus "insufficient to create a genuine issue of material fact") (citations and quotations omitted); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding, in response to uncorroborated affidavits, that "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data") (citation omitted).

Wieland also offers a declaration by one of her former departmental colleagues, Dr. Barry Spraggins, who evaluated Wieland's teaching and research performance for her 2012 and 2013 annual evaluations. (ECF No. 103 at 33-35.) Spraggins vaguely states that he "witnessed interactions" between Wieland and Dr. Bret Simmons, who would eventually sit on one of Wieland's tenure committees. (*Id.* at 34-35.) To Spraggins, "it was clear that [Simmons] disliked her and was unkind towards her." (*Id.* at 35.)

Defendant urges the Court to disregard Spraggins's affidavit because it contains hearsay, speculation, and is largely not based on personal knowledge. (ECF No. 105 at 12.) The Court agrees. While Spraggins declares having witnessed Simmons's "hostile and harassing behavior" toward Wieland, he provides no details as to when, where, and why Simmons was hostile toward Wieland. (ECF No. 103 at 35.) Moreover, Spraggins only evaluated Wieland's teaching and research performance in her 2012 and 2013

annual reviews; he did not participate in the tenure committees that reviewed and ultimately denied Wieland tenure. (*Id.* at 34-35.) Most of Spraggins's statements about Wieland's tenure application process are thus not based on personal knowledge. (ECF No. 105 at 12-13.) Moreover, Spraggins speculates about the motivations behind Dr. Simmons's negative views of Wieland, how Wieland's research record "would qualify her for tenure," and the "bias" he believes Wieland faced. (ECF No. 103 at 35.) The Court agrees that Spraggins's affidavit is largely speculative, conclusory, and contains inadmissible hearsay. "Conclusory or speculative evidence will not suffice to stave off summary judgment." *Med. Providers Fin. Corp. II v. New Life Ctrs., L.L.C.*, 818 F. Supp. 2d 1271, 1274 (D. Nev. 2011) (citations omitted).

Even if the Court considered Wieland's proffered evidence, the Court finds that Defendant has shown that no genuine issue of material fact exists as to whether Defendant—through its several committees and supervisors—denied Wieland tenure for gender-discriminatory reasons. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982) ("The burden of demonstrating the absence of an issue of material fact lies with the moving party.") (citation omitted). In consequence, the Court also finds that Wieland fails to "set forth specific facts showing that there is a genuine issue for trial" to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In other words, Wieland offers no evidence creating a genuine issue of material fact as to whether a discriminatory reason more likely than not motivated Defendant's decision to deny Wieland tenure.

Defendant has established that, like other tenure-eligible professors at NSHE entities, Wieland's tenure application was subject to the tenure standards and procedures within the Code, incorporated into Wieland's employment contracts. (ECF Nos. 97-1 at 17-19, 97-2 at 2, 97-5 at 14, 97-6 at 10-11, 104-1 at 2.) Wieland's contracts plainly classified Wieland as "tenure eligible," which Wieland understood to mean that tenure and promotion were discretionary and not guaranteed. (ECF Nos. 97-1 at 14, 97-2 at 2, 97-3 at 3, 104-1 at 2.)

Defendant has also established that both departmental committees reviewing Wieland's Tenure File followed the Code's procedures and applied all three mandatory standards—research, teaching, and service—before voting against tenure and promotion. (ECF No. 97-10 at 2-3, 7.) And Defendant has shown that the main reason for Wieland's denial of tenure were her multiple "unsatisfactory" ratings, and that a less-than-satisfactory rating in either teaching or research renders Wieland ineligible for recommendation for tenure. (ECF Nos. 97-1 at 17, 97-10 at 2-7.) It is true that one of the departmental committees noted Wieland's "upward[ ]" research trajectory, evidenced by recent high-quality journal publications and a recent "Researcher of the Year" award. (ECF No. 97-10 at 3.) Despite these achievements, this same committee nevertheless voted against tenure and promotion for Wieland after noticing "some issues about potential inconsistencies" raised by external review letters and the rest of her Tenure File. (*Id.*) Department chair Dr. Ron Lembke reviewed both committees' evaluations before making his own personal recommendation to the dean of the College of Business. (*Id.* at 2.) Lembke disagreed with one committee's "commendable" rating in research and gave Wieland an "excellent" rating in research (*Id.* at 3-5.) However, Lembke "strongly agree[d]" with the committee's "unsatisfactory" rating, citing the negative student evaluations that "overwhelmingly outnumbered the positive ones." (*Id.* at 6.) In the end, Lembke rated Wieland "excellent" in research, "unsatisfactory" in teaching, and "commendable" in service. (*Id.* at 7.)

Additionally, Defendant offers evidence showing that Defendant carefully reconsidered the reviewing committees' decisions to deny Wieland tenure, upon Wieland's request. (*See generally* ECF No. 97-12.) A university-wide committee reviewed not only Wieland's Tenure File, external review letters, and student evaluations, but also the reconsideration decisions of three lower committees, the department chair, and the dean. (*Id.* at 2-4.) After evaluating Wieland's strengths and weaknesses in both research and teaching, the university committee voted unanimously against tenure and promotion. (*Id.* at 4.)

The Court finds that the record is replete with undisputed evidence showing that Defendant, through its several committees and supervisors, voted against Wieland's tenure and promotion for several non-discriminatory reasons. Defendant has also established that, even if Wieland were eligible for tenure based on the Code's tenure standards, such a decision to appoint Wieland with tenure was ultimately discretionary and subject to multiple levels of approval. (ECF No. 97-1 at 17.) Defendant has therefore met its burden to establish that no genuine issue of material fact exists as to whether discriminatory reasons likely motivated its decision to deny Wieland tenure.

Wieland does not dispute the Code's mandatory tenure standards Defendant used in evaluating and reconsidering her Tenure File. Wieland also does not argue that Defendant considered any standard other than these three standards in reviewing her application. Nevertheless, Wieland argues that Defendant did not "equitably and uniformly" apply these standards to Wieland's case, mainly because Defendant "placed excessive emphasis on student evaluations," which are unreliable and tend to be biased against women. (ECF No. 103 at 20-24.) But Wieland offers no evidence showing that Defendant in fact weighed student evaluations any more than it has for male professors in her department or college. Indeed, the applications of three male comparators in Wieland's department show that their respective tenure committees also considered student course evaluations, both as quantitative scores and qualitative reviews. (ECF Nos. 109 (sealed) at 58, 60-61, 67-68, 76-77, 109-1 (sealed) at 50-54, 109-2 (sealed) at 6-7, 21.) It is true that Wieland's reviewing tenure committees placed significant emphasis on Wieland's student course evaluations in its tenure recommendations to the dean. (ECF No. 97-10 at 5-6.) However, the committee highlighted Wieland's student evaluations because they were some of the lowest and most negative in the department's history, and because Wieland had not provided the evaluations to the committees until the department chair requested them. (ECF No. 97-10 at 5-6.) Upon Wieland's request for reconsideration, one committee also considered the quality of Wieland's syllabi and course material—which were "in line" with similar department

courses but not "innovative"—and her "typical and not outstanding" external teaching. (ECF No. 97-11 at 9.) Even assuming that student evaluations are biased and imperfect metrics for teaching performance, the Court finds that Wieland offers no specific facts showing that a discriminatory reason more likely than not motivated its use of student course evaluations when considering Wieland's Tenure File. *See Anderson*, 477 U.S. at 256; *Reynaga*, 847 F.3d at 691.

Lastly, the Court finds Wieland's argument that Defendant did not equitably and uniformly apply its "Rules" unpersuasive. As Defendant notes, Wieland does not specify the "Rules" she challenges and, in any event, she offers no specific facts showing that Defendant did not apply its standards and procedures uniformly and equitably.

For these noted reasons, the Court finds that Defendant has established that no genuine issue of material fact exists as to whether a gender-discriminatory reason more likely than not motivated Defendant's decision to deny Wieland tenure. *See Reynaga*, 847 F.3d at 691. Wieland has not offered any specific facts or evidence showing that Defendant's denial of tenure was likely discriminatory or "mere pretext for unlawful discrimination." *Id.* Viewing the evidence in the light most favorable to Wieland, the Court finds that Wieland fails to establish that Defendant discriminated against her on the basis of gender when it denied her tenure.

### B.   Wieland's Remaining State-Law Claims (Claims 6, 7, and 8)

Wieland's remaining three state-law claims all stem from Defendant's discretionary decision to deny Wieland tenure, though they are based on different legal theories. In particular, Wieland contends that Defendant breached the parties' employment contracts and their implied covenants of good faith and fair dealing by "violating its [r]ules requiring equitable and uniform interpretation and application," and

by failing to consider pertinent materials in Wieland's Tenure File, such as annual reviews and external review letters about Wieland's research.[7] (ECF No. 103 at 27.)

### 1.    Discretionary-Act Immunity Under NRS § 41.032(2)

Defendant contends that because its decision to deny Wieland tenure is discretionary on multiple levels, it is statutorily immune from suit under NRS § 41.032(2). (ECF Nos. 97 at 28, 105 at 18.) The Court agrees.

NRS § 41.032(2) creates a "discretionary-function exception to the state's general waiver of sovereign immunity" and "provides complete immunity from claims based on a state employee's exercise or performance of a discretionary function or duty." NRS §§ 41.031(1), 41.032(2); *Martinez v. Maruszczak*, 168 P.3d 720, 726 (Nev. 2007).

In determining the scope of Nevada's discretionary-act immunity under NRS § 41.032(2), "which mirrors the Federal Tort Claims Act (FTCA)" in both purpose and substance, the Nevada Supreme Court has looked to federal case law to formulate a two-part test to determine whether a state entity and its employees are statutorily immune from suit. *Martinez*, 168 P.3d at 727 (citations omitted); *see also* 28 U.S.C. § 2680(a); *Scott v. Dep't of Com.*, 763 P.2d 341, 343 (Nev. 1988) (noting that because NRS § 41.032(2)'s exception to waiver of sovereign immunity is "practically identical" to the FTCA's discretionary-function exception, "federal precedents are relevant" to interpretations of NRS § 41.032(2)) (citations omitted); *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984) (recognizing the "underlying basis" of the FTCA's discretionary-function exception was Congress's wish "to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social,

---

[7]Wieland references a singular employment "contract" that she alleges Defendant breached when it denied her tenure. As a clarification, the record shows that the parties executed a new employment contract each fiscal year after UNR's president authorized Wieland's "reappointment" for the following fiscal year. (ECF Nos. 97-2, 97-4, 104-1.) Each fiscal year, Wieland's acceptance of the new employment contract was "in accordance with the provisions of NSHE Code, Title 2, Section 5.4.4." (ECF No. 97-4 at 3-4.) Defendant asserts that Wieland's 2016-2017 contract "is applicable for the 2017-2018 fiscal year as well." (ECF Nos. 97 at 3 n.3, 97-1 at 27.)

economic, and political policy through the medium of an action in tort"). The Nevada Supreme Court adopted the federal *Berkovitz-Gaubert* approach and clarified that "the actions of state actors are entitled to discretionary-act immunity if their decision (1) involves an element of individual judgment or choice and (2) is based on considerations of social, economic, or political policy." *Martinez*, 168 P.3d at 729; *see also Berkovitz by Berkovitz v. U.S.*, 486 U.S. 531 (1988); *U.S. v. Gaubert*, 499 U.S. 315 (1991). Although "the court need not determine that a government employee made a conscious decision regarding policy considerations in order to satisfy the test's second criterion," "discretionary decisions that fail to meet the second criterion of this test remain unprotected by NRS [§] 41.032(2)'s discretionary-act immunity." *Martinez*, 168 P.3d at 728 (citation omitted).

Applying the *Martinez* test to the facts here, the Court finds that Defendant's decision to deny Wieland tenure falls within NRS § 41.032(2)'s discretionary-function exception. To start, Defendant and its faculty are state actors for immunity purposes. The parties do not dispute that the faculty members overseeing Wieland's tenure process worked for UNR, one of Defendant's member institutions. Moreover, Defendant is a governmental entity created through the Nevada Constitution to govern and manage Nevada's public higher education institutions. (ECF Nos. 97 at 3-4, 103 at 5-9.)

As for the first *Martinez* criterion, Defendant's ultimate decision to deny Wieland tenure involved a series of decisions requiring the exercise of judgment and choice. *See Martinez*, 168 P.3d at 729. Wieland's tenure committee members and supervisors weighed, and even reconsidered, several factors from both internal and external sources to assess Wieland's individual performance in research, teaching, and service, as the Code requires. (ECF Nos. 97-10, 97-11, 97-12.)

The Code—incorporated into Wieland's employment contracts—makes clear that, even if a professor meets Defendant's tenure standards, she remains "eligible" for tenure and "may be recommended to the president for such appointment." (ECF Nos. 97-1 at 17, 97-2 at 2, 104-1 at 2.) Tenure was not guaranteed, which Wieland acknowledged.

(ECF No. 97-3 at 5.) Wieland's tenure application was subject to the final approval of the Board of Regents, which requires a majority vote. (ECF No. 97-1 at 17.) Simply put, the Board of Regents had discretion to grant or deny tenure. To successfully gain tenure, Wieland's application would have required multiple levels of discretionary recommendations and approval by departmental committees, supervisors, the college dean, the university president, and the Board of Regents. (ECF Nos. 97-1 at 17, 97-10, 97-11, 97-12.)

Indeed, in *Univ. of Nev., Reno v. Stacey*, 997 P.2d 812, 816 (Nev. 2000), a case involving a similar claim for breach of contract against UNR, the Nevada Supreme Court in dicta noted its agreement with UNR's alternative argument that it was statutorily immune under NRS § 41.032(2).[8] There, the Code also governed a UNR professor's employment contract and provided that the Board of Regents had final authority in granting tenure, subject to a majority vote. *Id.* at 814. Because the court saw "nothing ministerial . . . in a university's subjective decision to grant one of its professors lifetime employment," the court agreed with UNR's alternative argument. *Id.* at 816. The court also noted "the long-standing precedent recognizing that faculty appointment at the university level is an area poorly suited for judicial supervision, and thus one where judicial restraint must be exercised." *Id.* at 815 (citation omitted).

Similarly here, Defendant's decision to grant tenure was a discretionary act, that is, "an act that requires a decision requiring personal deliberation and judgment." *Id.* at 816 (citation omitted); *see also Martinez*, 168 P.3d at 729 (holding that a state actor's discretionary decision satisfies the first criterion of its two-part immunity test if it

---

[8]The Court recognizes that, since *Stacey*, the Nevada Supreme Court created the two-step *Martinez* test to determine whether a government action is immune from suit as a "discretionary act" under NRS § 41.032(2). *See Martinez*, 168 P.3d at 726-27. The *Stacey* court applied a previous "discretionary-versus-ministerial test," which protected "an officer's decisions or acts . . . so long as they were made using personal deliberation, decision, or judgment." *Id.* at 727. As the Court understands these precedents, the discretionary nature of Defendant's tenure decision (discussed in *Stacey*) speaks to the first *Martinez* criterion, *i.e.*, whether Defendant's decision "involve[s] an element of individual judgment or choice." *Id.* at 729.

"involve[s] an element of individual judgment or choice"). Defendant's decision thus satisfies the first criterion of the *Martinez* test.

The Court also finds that Defendant satisfies the second *Martinez* criterion. Defendant's tenure recommendation and reconsideration processes for Wieland involved decisions that Defendant based on its own policies under the Code, in addition to the rules and bylaws of UNR, its College of Business, and its Managerial Sciences Department. Moreover, committee members' and supervisors' tenure decisions serve broader social policies in higher education, such as "community engaged teaching," "research, scholarly, creative, or entrepreneurial activity," as well as commitments to "the best interests of the academic community" and "community engaged interaction with industry, business, government, and other institutions of our society." (ECF Nos. 97-1 at 17-18, 97-5, 97-6.) *See also Bryan v. Las Vegas Metro. Police Dep't*, 349 F. App'x 132, 134 (9th Cir. 2009) (finding that a city police department was "entitled to discretionary immunity" on state-law claims because individual officers' decisions "'were concerning the scope and manner in which [the department] conducts an investigation,' based on the policies of the [ ] police, and did not 'violate a mandatory directive.'") (quoting *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir. 2000)).

For these reasons, the Court finds that Defendant's decision, or series of decisions, to deny Wieland tenure was protected under NRS § 41.032(2). Plaintiff's three state-law claims challenging this decision are therefore barred.

### 2.     Merits of State-Law Claims

Even if NRS § 41.032(2) did not shield Defendant's discretionary actions, Wieland's state-law claims fail due to Plaintiff's failure to establish any genuine issue of material fact. The Court will address each claim in turn.

### a.     Breach of Contract Claim

Defendant has established the following through the plain language of Wieland's contracts and extrinsic evidence. First, Wieland's employment contracts unambiguously and exclusively incorporated the Code, which references the discretionary nature of

tenure decisions, and they classified Wieland as a "tenure eligible" professor. (ECF Nos. 97-1 at 17, 97-2 at 2, 97-3 at 3, 104-1 at 2.) *See also Stacey*, 997 P.2d at 814 (finding summary judgment "mandated" for the defendant university because the professor's contract was "unambiguous and susceptible to only one interpretation—UNR's decision to grant [the plaintiff professor] tenure was completely discretionary" under the Code and UNR rules and bylaws). Specifically, Wieland's contracts stated right above Wieland's signature that the Code, "exclusive of any bylaws or other policies, is incorporated herein and by this reference made a part of this contract." (ECF Nos. 97-2 at 2, 104-1 at 2.) Further still, Wieland's Tenure File remained subject to multiple levels of discretionary approval. The Code makes clear that, even if a professor satisfies the tenure standards, "recommendations for appointment with tenure shall be made by the president to the Board of Regents," which "has final authority in making the appointment with tenure" through an "affirmative majority vote." (ECF No. 97-1 at 17.)

Second, Wieland understood the nature and consequences of her status as a tenure-eligible professor—mainly that tenure was not guaranteed. (ECF No. 97-3 at 3.) And third, the record boasts copious evidence that, in deciding whether to grant Wieland tenure, Defendant exercised its discretion by objectively considering multiple internal and external sources (*e.g.*, annual performance reviews, external review letters, student course evaluations), in line with the Code (ECF Nos. 97-1 at 17-19, 97-10, 97-11, 97-12.)

In contrast, Wieland offers no evidence showing Defendant breached its obligations under any of Wieland's employment contracts at UNR. (ECF No. 103 at 26-27.) As noted, Wieland offers no specific facts showing that Defendant failed to evaluate her "equitably and uniformly" under the Code's tenure standards; Defendant twice considered Wieland's strengths, weaknesses, and potential for growth in the areas of research, teaching, and service. (ECF Nos. 97-10, 97-11, 97-12, 103 at 23-24, 26-27.) Moreover, Wieland's reliance on university, college, and departmental bylaws are irrelevant, since they are clearly not part of the contract; the Code is the only document

incorporated into Wieland's contract. (ECF Nos. 97-2 at 2, 103 at 5-9, 104-1 at 2.) *See also LaForge v. State, Univ. and Cmty. Coll. Sys. of Nev.*, 997 P.2d 130, 134-35 (Nev. 2000) (noting that summary judgment could have been alternatively granted for defendant university because plaintiff professor, in pertinent part, "conceded that he was nontenured, [and] the [Nevada University] Code was made a part of his employment contract," "which mentions the Code but makes no mention of the Bylaws"; finding that, "based on reading the plain language of the contract . . . the Code was incorporated into the terms of the contract but the Bylaws were not," making the application of the bylaws "irrelevant"). While Wieland was understandably dissatisfied with the outcome of her tenure application process, mere dissatisfaction, alone, does not defeat summary judgment on her breach of contract claim. The Court thus grants summary judgment as to Wieland's breach of contract claim.

> **b.      Breach of the Implied Covenant of Good Faith and Fair Dealing Claim**

The Court finds no genuine issue of material fact as to whether Defendant breached the implied covenant of good faith and fair dealing of Wieland's contract. As previously explained, the Code—the only institutional rules incorporated into Wieland's contract—laid out the timeline, conditions, and standards for appointment of tenure. (ECF Nos. 97-2 at 2, 104-1 at 2.) Wieland's annual contracts also clearly classified Wieland as "tenure eligible," and Wieland indicated in her deposition that she understood that tenure was not guaranteed while employed as a tenure-eligible professor. (ECF Nos. 97-1 at 15-19, 97-3 at 3.) Despite Wieland's assertion that her tenure committees' decisions to deny her tenure were "inexplicable," Defendant has put forth evidence showing that committee members clearly explained to Wieland—both initially and upon reconsideration—the methods and reasons supporting their conclusions as to Wieland's probationary performance. (ECF Nos. 97-11, 97-12.) Wieland offers no evidence creating a genuine issue of material fact as to whether Defendant "act[ed] in a manner unfaithful to the purpose of the contract," denied Wieland's reasonable contractual

expectations under special circumstances, or otherwise "deliberately countervene[d] the intention and spirit of the contract." *See Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919, 922-23 (1991) (explaining that a plaintiff may recover for breach of the implied good-faith covenant even if a defendant has not breached the contract's terms, and noting that denial of a party's justified expectations "is determined by the various factors and special circumstances that shape these expectations") (citations omitted).

### c. Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Defendant has also established that summary judgment is appropriate for Wieland's tortious breach of the implied good-faith covenant claim. Wieland's tort claim is grounded in the employer-employee relationship between the parties, and Defendant has shown that Wieland was treated like other tenure-eligible employees who had applied for tenure before her. (ECF Nos. 97-2 at 2, 97-3 at 3-4, 104-1 at 2, 109 (sealed), 109-1 (sealed), 109-2 (sealed)). Wieland offers no evidence showing "a special element of reliance or fiduciary duty" or "special relationship between the victim and the tortfeasor." (ECF No. 103 at 24-25.) *See also Hilton Hotels*, 784 P.2d at 923 (distinguishing the contract action and tort action for breach of the implied good-faith covenant, in that "the tort action requires a special element of reliance or fiduciary duty," *e.g.*, an insurer's bad-faith refusal to pay an insured on his valid claims, or an "abusive and arbitrary dismissal" of employee by large employer) (citing *U.S. Fid. & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975); *K Mart v. Ponsock*, 732 P.2d 1364, 1372 (Nev. 1987)); *A.C. Shaw Const., Inc. v. Washoe Cnty.*, 784 P.2d 9, 10 (Nev. 1989) (recognizing that tort liability for breach of the implied covenant of good faith and fair dealing exists when "there exists a special relationship between the tort victim and the tortfeasor") (citation omitted). Wieland is correct that Defendant occupied a "palpable" position of power in the parties' contractual relationship as Wieland's employer. (ECF No. 103 at 26.) But again, Wieland offers no evidence showing that such a power dynamic substantially differed from any other employer-employee relationship.

## IV.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Defendant's motion for summary judgment (ECF No. 97) is granted.

It is further ordered that the Clerk of Court enter judgment accordingly and close this case.

DATED THIS 16th Day of February 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE